Sarah M. GOOSTREE, Plaintiff-Appellant (84–5752), Plaintiff-Appellee (84–5869),

v.

STATE OF TENNESSEE, et al., Defendants,

Montgomery County, Tennessee, Defendant-Appellant (84–5869),

Montgomery County Quarterly Court, et al., Defendants-Appellees (84–5752).

Nos. 84–5752, 84–5869.

United States Court of Appeals, Sixth Circuit.

Argued May 5, 1986.

Decided July 17, 1986.

Rehearing and Rehearing En Banc Denied Sept. 15, 1986.

Stafford McNamee, Jr. (argued), Bass, Berry and Sims, Henry Haile, Nashville, Tenn., for Montgomery County, Tenn., Montgomery County Quarterly Court, et al.

Callis L. Childs (argued), Conway, Ark., for Sarah M. Goostree.

Before ENGEL, CONTIE and RYAN, Circuit Judges.

CONTIE, Circuit Judge.

Sarah M. Goostree, plaintiff, and Montgomery County, Tennessee, defendant, appeal from orders of the district court entering judgment in favor of defendants on Goostree's complaint alleging sex discrimination in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, and the civil rights statutes, 42 U.S.C. §§ 1983, 1985, and denying defendant's motion for costs. For the reasons that follow, the judgment of the district court is affirmed in part and reversed in part.

### I.

On September 6, 1978, Sarah M. Goostree filed a complaint against the State of Tennessee, Montgomery County, the Montgomery County Quarterly Court, the Court Nursing Home Committee, Arthur Hunt, Mercer McKinney, Lorenza Collier, George Watson, William O. Beach, Mike Allen, Raymond F. Jarrell, and Don R. Van Meter asserting jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), 42 U.S.C. §§ 1983, 1985(3). Hunt, McKinney and Collier were members of the Quarterly Court and nursing home committee, over which Beach presided. Watson was administrator for the Tennessee Board of Licensure of Health Care Facilities. Allen was the personnel director of Montgomery County. Jarrell was the administrator of the Montgomery County Nursing Home for twenty years prior to the events giving rise to this action. Don Van Meter was an assistant administrator at the home under Jarrell, and was appointed to replace Jarrell. In Count I, Goostree alleged that she was told by Jarrell, when she inquired about the administrator's position at the nursing home, that "the Administrator should be a man, and, further, that he was at that time training a man for the job." Goostree alleged that the selection process was discriminatory in violation of the Fourteenth Amendment and 42 U.S.C. § 1983. In Count II, Goostree alleged violation of 42 U.S.C. § 1985(3), and, in Count III, alleged violation of 42 U.S.C. § 1986. Counts IV through VI alleged pendent state claims. On February 22, 1979, the district court dismissed the State of Tennessee and George Watson from the case. Defendant Collier was also dismissed from the case with prejudice.

Trial was held in December 1980 at which the following testimonial and documentary evidence was adduced.

The advertisement for the administrator position ran in the August 2, 1977 Clarksville Leaf Chronicle and indicated applications would be accepted until August 12. The ad read:

> Applicants must possess or be in the process of obtaining an Administrator's license from the State of Tennessee. This position requires top administrative and supervisory ability. Experience in nursing home or hospital administration desired.

Don Van Meter's letter of July 19, 1977 to George Watson indicated "[i]t was the intention of the facility and myself, at the time of employment, to train me to replace the present administrator." The remainder of the letter reflects Van Meter's belief unequivocally that he would be the next

administrator and that he was seeking permission to be licensed temporarily on behalf of the committee. On September 2, after Van Meter's call of September 1, Watson wrote that "[t]he Board of Licensing Health Care Facilities will accept an interim administrator, who is pursuing the obtaining of a license for a reasonable time provided the nursing home continues to operate in a satisfactory manner."

The minutes of the July 21, 1977 committee meeting attended by Hunt and McKinney set out the following five guidelines for hiring a new administrator.

1. Possess or be in the process of obtaining a Nursing Home Administrator License from the State of Tennessee.

2. Possess or be in the process of obtaining a Water and Waste Water License from the State of Tennessee.

3. Ability and experience in Nursing Home Administration. (Accounting and budgeting procedures, supervision of personnel, hiring and terminating personnel, maintaining federal and state nursing home standards, bids and contracts procedures.)

4. Knowledge in plant maintenance, to assist and advise maintenance personnel in plant maintenance.

5. Provide security for the Nursing Home at all times.

The August 18 minutes indicate that the committee reviewed the five applications for the job, and McKinney moved that three be selected for interview. Goostree, Slaughter, and Van Meter were selected. At the August 25 meeting Goostree and Van Meter were interviewed, and two voted for Van Meter, and one for Goostree. On September 7, after voiding the selection of Van Meter, the committee interviewed Goostree, Van Meter, and two other candidates, and selected Van Meter unanimously. At the September 29 meeting, the committee agreed to employ Jarrell as consultant for three months and to enlarge the administrator's home to accommodate Van Meter's family.

A roster of the home's employees effective September 7, 1977, indicated that only ten percent (6 of 65) of the employees were men. Of course, men, Van Meter and Jarrell, held the two highest paying positions at the home.

Michael Allen, assistant to Judge Beach, testified that he told the nursing home committee that Goostree had reported that she was a licensed administrator in Tennessee and had given Allen her license number. Allen indicated that the newspaper advertisement for the position had been published on August 2, with a deadline of August 12, for a position to be open on October 1. The time lag between the deadline and opening of the position was to allow time to decide on a candidate. Allen recalled that the retention of Jarrell as consultant was discussed at a September 7 meeting regardless of who served as administrator. Allen testified that "until he [Van Meter] had actually been issued his license there would have to be an interim administrator, someone with a license who would serve on one or two days a week, something like that, as a requirement to fill the regulation that requires a licensed administrator." Allen testified that this would be similar to a consultant. Allen testified that the opinion at the September 7 meeting was that if the new administrator was not yet licensed, "a consultant would be mandatory," but that a consultant would be a good idea even if the administrator was licensed. Allen was told by Van Meter that Van Meter had been cleared by the state to serve as administrator without a license in July 1977. Allen testified that further investigation into the state licensing requirement was precluded by George Watson's letter indicating that the state would not oppose a temporarily unlicensed administrator.

Donald E. Bankey testified that he applied for the administrator's position and was interviewed. Bankey testified that Jarrell had indicated that he was grooming his assistant for the administrator's job.

Judge Beach testified that Van Meter was the best applicant. Each interview on

September 7 was about thirty minutes and all applicants were asked the same questions. Beach indicated that he told Goostree that he did not think that the committee would necessarily want a man for the job. At the interview, Van Meter informed the committee of the letter from the state and that he could serve as administrator until he received his license. Beach testified that he was unsure whether it was mandatory to have Jarrell as a consultant prior to issuance of Van Meter's license.

Lorenza Collier, a member of the nursing home committee, testified that she believed the guidelines developed by Hunt and McKinney for hiring a new administrator were good, but that having a license by October 1 was not essential. Collier never heard anything said about the administrator's job being a man's job. Collier initially voted for Goostree at the first selection, but changed her vote after the second interview to make Van Meter's selection unanimous. Collier had moved at the August 30 meeting that the selection of Van Meter be set aside and that reinterviews be made. Collier also testified that on September 7 she was unaware that Jarrell would be a consultant.

Lawrence Edge, an assistant administrator at the nursing home, testified that Jarrell told him that a woman could not run the nursing home.

Plaintiff Goostree testified that in May 1977 she contacted Jarrell about the administrator position at the home and was told that a man was needed for the job because the home was in a rural area and that Jarrell was training a man for the job. Goostree contacted Hunt and was encouraged to meet other members of the committee and express her interest in the job. Goostree talked to Mercer McKinney who assured her that there was no politics involved in the administrator decision. Goostree did not talk to Collier, but talked to Beach who assured her that the process would be conducted fairly.

Goostree testified that when she learned that Van Meter had been selected she went to see Beach because she knew Van Meter

did not have a license. Beach told Goostree he would ask the committee to set aside the selection and reinterview. Goostree testified that she then heard that Van Meter had received permission to serve as administrator until he was licensed. Goostree, who had served as a nursing home administrator in Louisiana, testified that the committee's questions about wandering patients and mechanical skills telegraphed the impression that it was looking for a man. Goostree indicated that she had some experience in budgeting as an administrator for a nursing home and in completing Medicaid reports. Goostree testified that she had heard a rumor that she was denied the job because of a drinking problem.

Goostree had been in charge of delinquent accounts for Christian Home for the Aged, and denied testimony that she had treated two black male orderlies in a demeaning manner. Goostree testified that tension between herself and Tommy Kay, her supervisor at the home, arose because of her expressions of dissatisfaction with Kay's management ability. Goostree did not list this experience on her application because she did not believe that it was relevant work experience. Goostree testified that she could administer the Montgomery County Nursing Home without an assistant or a consultant.

Judy Graham testified that she had been a member of the nursing home committee when the assistant administrator position was created. The position was created in hopes of maintaining continuity after Jarrell's retirement, but that no guarantee of promotion was made. Graham testified that McKinney and Van Meter were old Army buddies.

Arthur Hunt testified that on July 21, 1977 he met with Mercer McKinney to develop guidelines for the administrator's job. Van Meter and Jarrell were not present. The guidelines were developed from the Montgomery County Nursing Home policy manual. The manual provided that the administrator must fulfill the state license requirement, but this was changed to re-

quire that an applicant be in the process of obtaining a license in order to accommodate out of state applicants. The new guidelines also required the administrator to formulate policy and procedure relative to the security of the home and its patients. Hunt testified that Van Meter performed better than Goostree in the September 7 interview. Hunt testified that "after the last interview someone said something about her drinking problem out in the community." Hunt testified that the revised guidelines for the administrator were not tailored for a man. Hunt testified that there was no understanding that Van Meter was hired and trained to replace Jarrell.

Hunt testified that the maintenance requirement in the guidelines and the waste water license requirement did not cause Goostree not to be selected. None of the candidates had waste water licenses. Administrator licensing was not a factor since Goostree had her license and Van Meter had the letter from George Watson. Hunt voted for Van Meter because of education, army experience, letters of recommendation, and experience at the nursing home. Goostree had less education, and had only 2½ years of experience as a nursing home administrator. Sex was never discussed as a criterion. Hunt testified that the issue of a consultant first came up at the September 29 meeting and that Jarrell would have been hired as a consultant regardless of who was hired as an administrator.

Raymond Jarrell denied telling Goostree in early 1977 that the administrator's job was a man's job. Jarrell served as consultant from October 1, 1977 until January 2, 1978. Jarrell was asked about the consultant position soon after he announced his intention to retire.

Tommy Kay, an administrator at the Christian Home for the Aged in Texas, testified that Goostree was employed at the home from January to May, 1977 as Kay's administrative assistant. Kay fired Goostree because of complaints about her treatment of family members and black employees.

Michael Lutche, who worked with the state office of Local Classification Compensation Services, testified that his office had developed definitions and qualifications for the Montgomery County nursing home administrator. Lutche testified that waste water license was not included in the requirement because it was rare to find an administrator with such a license.

Mercer McKinney testified that the committee developed guidelines for selection of an administrator. McKinney interpreted the reference in the guidelines to security to require the administrator to develop policies on security and not to personally provide for security. The security requirement did not require a man. The purpose of broadening the license requirement to consider applicants in the process of getting their license was to avoid limiting applicants to Tennessee residents. The waste water license requirement was added to the guidelines because of Jarrell's past practice with the license. The purpose of the waste water license requirement was to save the home money. McKinney thought in July 1977 that the license was easy to obtain and did not know that one year of experience at a waste water plant was required prior to taking the examination. The guideline on plant maintenance was meant to hire someone capable of supervision not to require that the administrator perform maintenance on his own. The administrator was to assist the home maintenance man in order to save money.

McKinney denied telling Goostree that the administrator's job was a man's job. McKinney testified that stability, administrative ability and personnel ability were important traits in the candidates. McKinney voted for Van Meter due to more work experience and better reference letters. Van Meter's answers were more to the point while Goostree's were evasive. That Van Meter had worked at the home was a factor in the selection. McKinney could not recall discussion of Jarrell as consultant prior to September 29, 1977. The hiring of Jarrell was to provide a smooth transition and would have been appropriate

regardless of who was hired as administrator.

Don Van Meter testified that he wrote to Watson to determine whether he could even compete for the administrator's position. Van Meter testified that he did not tell Watson that licensed applicants were available. Van Meter admitted that he would not have been able to apply for the position except for the "in the process" language in the guidelines with respect to the licensing requirement. Van Meter called George Watson on September 1, and sought some reply to his request to be temporarily licensed. Van Meter indicated that no one asked him to call Watson.

George Watson, chief of the licensing section of the Tennessee Licensing Board for Health Care Facilities, testified that he informed Van Meter by letter of September 2, 1977 that the home would not be in non-compliance with state law if an unlicensed individual acted as administrator on an interim basis. The Board had allowed such unlicensed practice in the past. Van Meter did not tell Watson that there were licensed applicants for the position.

■ Jerry Wilson, Goostree's supervisor at Beauregard Nursing Home, testified that he asked Goostree to resign because of problems with accounts receivable, the cleanliness of the home, care of the residents, and rapport of Goostree with the residents.[1]

Mary Woodall testified that Jarrell had offered her the assistant administrator position. Woodall declined for personal reasons. Woodall wrote a letter of recommendation for Van Meter.

On December 23, 1980, the court entered judgment on the jury's verdict with respect to the claims based on 42 U.S.C. §§ 1983, 1985(3) in favor of defendants. On May 31, 1984, the district court entered judgment for the defendants on Goostree's Title VII claim. The court found that "[m]uch of the plaintiff's employment experience has little

relevance to nursing home administrator." The court found that Goostree had not proven discrimination under a disparate impact theory. Under a disparate treatment theory, the court found that plaintiff had established her prima facie case and that the defendants had proffered a legitimate non-discriminatory reason for Van Meter's selection, prior experience and successful performance. With respect to pretext, the court found:

> The defendants relied on Watson's opinion in order to comply with state and federal licensing requirements and not to accomplish some discriminatory purpose. Clearly, Van Meter was actively pursuing obtaining his license and because of his satisfactory performance at the Home and prior experience, the defendants chose to hire Van Meter pending the results of the licensing exam.

On June 11, 1984, Goostree moved for a new trial. On July 2, 1984, the defendants sought costs pursuant to Fed.R.Civ.P. 54(d), 28 U.S.C. § 1920, and 42 U.S.C. § 1988. Defendants sought costs for court reporters, copying, preparation of exhibits, fees for witnesses, depositions, air fare for impeachment witnesses, and expenses in locating witnesses, totaling $7,498.89. The motion for a new trial was denied on July 6, 1984. On August 23, 1984, the court denied the motion for costs, and found that "plaintiff's unsuccessful civil rights petition was [not] frivolous in nature." Goostree and the County appeal.

## II.

■ Goostree contends that Van Meter was preselected for the administrator position, and that, therefore, the committee's contention that Van Meter was selected based on his prior experience and qualifications is necessarily a pretext for sex discrimination. After the plaintiff has established her prima facie case and defendants have articulated a legitimate non-discriminatory reason for not hiring Goostree,

---

**1.** It is clear that the testimony of Tommy Kay and Jerry Wilson with respect to Goostree's past performance was not available to the commit-

tee, and, accordingly, cannot be considered as support for the committee's decision not to hire Goostree.

[a]t that point, the presumption of discrimination "drops from the case" [*Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 255 n. 10, 101 S.Ct. 1089, 1095 n. 10, 67 L.Ed.2d 207 (1981)] and the District Court is in a position to decide the ultimate question in such a suit: whether the particular employment decision at issue was made on the basis of race. *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711 [103 S.Ct. 1478, 75 L.Ed.2d 403] (1983); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. at 253 [101 S.Ct. at 1093]. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff regarding the particular employment decision "remains at all times with the plaintiff," *ibid.*, and in the final analysis the trier of fact "must decide which party's explanation of the employer's motivation it believes." *United States Postal Service Board of Governors v. Aikens*, 460 U.S. at 716 [103 S.Ct. at 1482].

*Henry v. Lennox Industries, Inc.*, 768 F.2d 746, 750 (6th Cir.1985) (quoting, *Cooper v. Federal Reserve Bank of Richmond*, 467 U.S. 867, 104 S.Ct. 2794, 2799, 81 L.Ed.2d 718 (1984)). Further,

> [i]n establishing pretext, the plaintiff "may succeed ... either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256 [101 S.Ct. at 1095]. It is clear that the plaintiff need not introduce new evidence regarding pretext. "[T]here may be some cases where the plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation." *Id.* at 255 n. 10 [101 S.Ct. at 1095

n. 10]. Further, "[w]here the defendant has done everything that would be required of him if the plaintiff had properly made out a *prima facie* case, whether the plaintiff really did so is no longer relevant." *Aikens*, 103 S.Ct. at 1482.

*Id.* at 750–51.

"[W]e recognize that the desire to hire a more qualified applicant is the basis for a legitimate business decision especially [as in this case] when management is involved, ... and that the fact that the court finds that the employer misjudged the qualifications of its applicants does not expose such employer to Title VII liability." *Id.* at 751. Likewise, "the legitimacy of the articulated reason for the employment decision is subject to particularly close scrutiny where the evaluation is subjective." *Grano v. Department of Development of City of Columbus*, 699 F.2d 836, 837 (6th Cir. 1983); *Henry*, 768 F.2d at 751. Evidence of preselection operates to discredit the employer's proffered explanation for its employment decision. *Coble v. Hot Springs School District No. 6*, 682 F.2d 721, 728–29 (8th Cir.1982); *EEOC v. Safeway Stores, Inc.*, 634 F.2d 1273, 1281 (10th Cir.1980), *cert. denied*, 451 U.S. 986, 101 S.Ct. 2321, 68 L.Ed.2d 844 (1981); *United States v. Wattsburg Area School District*, 429 F.Supp. 1370, 1378 (W.D.Pa.1977). *See also Abrams v. Johnson*, 534 F.2d 1226, 1229–30 (6th Cir.1976); *Hartman v. Wick*, 600 F.Supp. 361, 364 (D.D.C.1984). Preselection, of course, does not violate Title VII when such preselection is based on the qualifications of the preselected party and not on some basis prohibited by Title VII. *Kennedy v. Landon*, 598 F.2d 337, 341 (4th Cir.1979). However, preselection is relevant evidence of the employer's motivation.

Our review of the factual conclusions of the district court is rather circumscribed.[2]

---

**2.** Pursuant to Fed.R.Civ.P. 52(a), "we review the district court's findings of fact for clear error." *Henry v. Lennox Industries, Inc.*, 768 F.2d 746, 749 (6th Cir.1985).

There are no distinctions between ultimate and subsidiary findings of fact, the predominant issue of intent in Title VII cases is factu-

al, and the deferential standard of Fed.R.Civ. Pro. 52 does not apply to questions of law. *Pullman-Standard v. Swint*, 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982). In *Anderson v. City of Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985), the Court reiterated that a reviewing court may only

■ We agree with Goostree that the evidence clearly suggests that Van Meter was preselected. This fact casts serious doubt on the credibility and legitimacy of the committee's proffered reasons for selecting Van Meter. However, there is little evidence from which to conclude that sex was the basis for this preferential treatment. We have recently stressed the difference between a hiring process that proceeds based on legally impermissible distinctions between candidates and a "patronage system that relies on family, friends, and political allies." *Avery v. Jennings*, 786 F.2d 233, 237 (6th Cir.), *cert. denied*, — U.S. —, 106 S.Ct. 3276, 91 L.Ed.2d 566 (1986). The defendants are not subject to liability on a Title VII claim if they hired Van Meter based on such criteria not prohibited by Title VII. We, of course, defer to the district court with respect to matters of credibility and sustain the district court's findings if we find such plausible. While the evidence in this case is conflicting, and subject to variable interpretations, we cannot say that the district court clearly erred in finding that the defendants did not act with a statutorily prohibited animus in rejecting Goostree for the job.

### III.

■ Goostree requested the following instruction:

If any defendant has carried the burden of showing a legitimate, nondiscriminatory reason why plaintiff was not selected for the position, you shall nevertheless find that defendant guilty of sex discrimination if plaintiff has shown, by a preponderance of the evidence, either (1) that the defendant's stated reason is a pretext, or false reason, or (2) that notwithstanding the legitimate, nondiscriminatory reason for not selecting plaintiff, the defendant did not give plaintiff's application the full consideration it warranted, wholly or partially because of her gender (sex). Thus, if sex was a factor in the failure to hire plaintiff, a female, then you must find sex discrimination occurred, regardless of whether the male who was hired, defendant Van Meter, was more qualified.

The district court declined to give this instruction but instructed as follows:

If you find that defendants gave a legitimate non-discriminatory reason for hiring Don Van Meter, then the plaintiff has the opportunity to show that the defendants' stated reason is in fact a pretext. The burden of persuasion remains with the plaintiff.

If you find, however, from the preponderance of the evidence that plaintiff was not hired because she was a woman, then such refusal to hire would not be lawful exercise of the defendants' authority and would be a violation of plaintiff's civil rights.

Goostree's contention is that the district court erred in refusing to give the "sex as a factor" instruction.[3]

overturn the district court's findings when the court "is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). "The reviewing court oversteps the bounds of its duty under Rule 52 if it undertakes to duplicate the role of the lower court." *Anderson*, 105 S.Ct. at 1511.

If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. *Id.* at 1512. Further, "[w]hen findings are based on determinations regarding the credibility of witnesses, Rule 52 demands even

greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Id. Id.* at 750.

3. Defendant contends that plaintiff has not properly preserved the alleged error in the challenged instruction for appeal. Fed.R.Civ.P. 51 provides that "[n]o party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict...." Rule 51 "does not require formal objections," but "is satisfied only if it is clear that the judge was made aware of the possible error in or omission from the instructions." *Gradsky v. Sperry Rand Corp.*, 489

Causation in the Title VII context is an elusive concept.[4] The Court has not held "that the Title VII plaintiff must show that he would have in any event been rejected or discharged solely on the basis of his race, without regard to the alleged deficiencies; ... no more is required to be shown than that race was a 'but for' cause." *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 282 n. 10, 96 S.Ct. 2574, 2580 n. 10, 49 L.Ed.2d 493 (1976); *Blalock v. Metals Trades, Inc.*, 775 F.2d 703, 709 (6th Cir.1985). "This 'but for' causation is satisfied when the plaintiff establishes that the defendant's discriminatory intent more likely than not was the basis of the adverse employment action." *Id.* The *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) evidentiary framework incorporates both the questions of motivation and causation. "The very showing that the defendant's asserted reason was a pretext for race is also a demonstration that but for his race plaintiff would have gotten the job." *Bibbs v. Block*, 778 F.2d 1318, 1321 (8th Cir.1985) (*en banc*).

■ The district court in this case properly instructed on the *McDonnell Douglas/Burdine* standards. Goostree has never suggested that this is a dual motive case or a case in which direct evidence of discrimination is available, thereby making the application of *McDonnell Douglas* inappropriate. *See Blalock, supra; Bibbs, supra.* The mere showing that "sex was a factor" rather than a "but for" factor is insufficient to establish liability under Title VII. Accordingly, the court did not err in declining to deliver the contested instruction.

F.2d 502, 503 (6th Cir.1973). Further, "[t]he court, insofar as the instructions were covered by the appellant's proposals ..., was aware of the appellant's objections to the charge as given." *Id.* Goostree claims that the district court specifically refused to include her proposed instruction, and that she is not barred from asserting such as error on appeal. Under *Gradsky,* the propriety of the instruction is properly raised.

4. We recognize that:

## IV.

Defendants sought to recover several costs in this case. Fed.R.Civ.P. 54(d) provides that "[e]xcept when express provision therefor is made either in a statute of the United States or in these rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs."

28 U.S.C. § 1920 provides in pertinent part:

A judge or clerk of any court of the United States may tax as costs the following:

(1) Fees of the clerk and marshal;

(2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;

(3) Fees and disbursements for printing and witnesses;

(4) Fees for exemplification and copies of papers necessarily obtained for use in the case.

■ We have recently considered the applicable standards in reviewing a district judge's denial of costs to a prevailing party.

The rule establishes a norm of action: prevailing parties are entitled to their costs as of course. Departures from the rule are permitted; however, "when rules prescribe a course of action as the norm but allow the district court to deviate from it, the court's discretion is more limited than it would be if the rule were nondirective." *Coyne-Delany,* 717 F.2d 385, 392 (7th Cir.1983).

Before the district court, "it is incumbent upon the unsuccessful party to show circumstances sufficient to overcome the presumption" favoring an award of costs

A plaintiff who alleges disparate treatment by a state employer is bringing essentially the same claim under Title VII as under § 1983. If there is liability under Title VII, there should be liability under § 1983. Similarly, if there was no discriminatory intent, there cannot be liability under either Title VII, on a disparate treatment theory, or § 1983.

*Grano v. Department of Development,* 637 F.2d 1073, 1082 (6th Cir.1980).

to the prevailing party. *Lichter*, 269 F.2d [142] at 146. Before the appellate court, however, the party seeking reversal of a discretionary denial of costs must show that the district court committed an error in applying the criteria of this court.

*White & White, Inc. v. American Hospital Supply Co.*, 786 F.2d 728, 731–32 (6th Cir. 1986). Costs may properly be denied "where taxable expenditures by the prevailing party are 'unnecessary or unreasonably large,'" "where the prevailing party should be penalized for unnecessarily prolonging trial or for injecting unmeritorious issues," or where the case is "'close and difficult.'" *Id.* at 730. "The closeness of a case is judged not by whether one party clearly prevails over another, but by the refinement of perception required to recognize, sift through and organize relevant evidence, and by the difficulty of discerning the law of the case." *Id.* at 732–33. An inappropriate factor to consider is "the ability of the prevailing party to pay his or her costs." *Id.* at 730. We have also held that "[t]he good faith of unsuccessful litigants is a relevant consideration in Rule 54(d) deliberations. Good faith without more, however, is an insufficient basis for denying costs to a prevailing party." *Id.* at 731.

▮ The district court apparently considered the defendants' motion as solely brought pursuant to § 1988. The prevailing party in a civil rights action, however, is in the same position as any other prevailing party with respect to costs available pursuant to 28 U.S.C. § 1920. *Northcross v. Board of Education of Memphis City Schools*, 611 F.2d 624, 640 (6th Cir.1979), *cert. denied*, 447 U.S. 911, 100 S.Ct. 3000, 64 L.Ed.2d 862 (1980). The district court denied costs because Goostree's case was not frivolous. In light of our decision in *White & White*, this is clearly an incorrect standard.

In light of the many factual findings that are required in assessing and calculating an award of costs, we remand the case to the district court to apply the standards set out in *White & White*, and, more specifically, in 28 U.S.C. § 1920, in determining the extent to which an award of fees is appropriate.

Accordingly, the judgment of the district court is AFFIRMED in part, REVERSED in part, and REMANDED to the district court for further proceedings consistent with this opinion.