**Charles CLEMENT, Plaintiff,**

v.

**Edward MADIGAN, Secretary of Agriculture, Defendant.**

No. 5:91–cv–18.

United States District Court, W.D. Michigan, S.D.

Oct. 28, 1992.

See also 820 F.Supp. 1035.

Mark T. Light, Mark T. Light Law Offices, Lansing, MI, for plaintiff.

Agnes M. Kempker–Cloyd, Asst. U.S. Atty., Grand Rapids, MI, for defendant.

### OPINION AND ORDER ON DEFEN-DANT'S MOTION FOR SUM-MARY JUDGMENT

MILES, Senior District Judge.

Plaintiff Charles Clement, an employee of the United States Department of Agriculture ("USDA"), has filed this action under Title VII of the Civil Rights Act of 1964 (as amended), alleging that the failure to select him for a promotion was the result of unlawful discrimination on the basis of race and retaliation. The defendant, the Secretary of Agriculture [1], has moved for summary judgment under Fed.R.Civ.P. 56. Plaintiff has opposed the motion. Neither party has requested oral argument on the motion pursu-

---

**1.** Edward Madigan, presently the Secretary of Agriculture, is hereby substituted as defendant in place of Clayton Yeutter, former Secretary of Agriculture, pursuant to Fed.R.Civ.P. 25(d)(1).

ant to Local Rule 29(d). For the reasons which follow, the defendant's motion is **GRANTED** as to the claim of retaliation and DENIED as to the claim of race discrimination.

## FACTS

In September, 1970, plaintiff Charles Clement, who is black, was hired by the USDA's Agricultural Research Service ("ARS") to work as an animal caretaker at the ARS' Regional Poultry Research Laboratory ("RPRL") located in East Lansing, Michigan. The RPRL is a laboratory where research on diseases of poultry is conducted. Poultry are bred and raised at the RPRL for use in research.

The RPRL laboratory is divided into two separate parts. On the east side of the farm, the actual experiments on poultry are conducted. On the west side of the farm, the birds are bred and raised. Because of the risk of contaminating the healthy birds on the west side of the lab, employees working on the east side of the lab, where the experiments are performed, are basically isolated from those who work on the west side of the lab. When plaintiff was hired to work at the RPRL, he assumed his duties on the west side of the lab as a wage grade employee. These duties included, among other things, artificial insemination of chickens, bleeding of chickens,[2] and banding of chickens.[3] In 1975, plaintiff received informal recognition as "Employee of the Month" for his work with poultry. This honor was bestowed by Dr. Richard Witter, the Laboratory Director and Research Leader.

Another significant event in plaintiff's employment took place in January, 1979. On January 11, 1979, Dr. Witter and Tom Wilcox, a Supervisory Poultry Scientist and plaintiff's supervisor at the time, confronted plaintiff with information they had received indicating that he had been taking eggs from the lab in violation of a policy prohibiting this activity. Plaintiff admitted that he had been doing this for years, and he implicated other employees in this activity as well as in other misuses of government property. He agreed to stop taking eggs, and also agreed to be "an example" to the other employees and to inform Wilcox of any ethics violations which he observed.

In March, 1979, plaintiff received an official letter or reprimand for the unauthorized removal of eggs from the lab. Plaintiff declined to sign a receipt for the letter, which was placed in his personnel file. Subsequently, he contacted the National Association for the Advancement of Colored People ("NAACP"), complaining that he was the only employee to have been issued a letter of reprimand for stealing eggs, although others—presumably white employees—had also stolen them. On September 12, 1979, two NAACP representatives paid an unannounced visit to the lab and spoke with Dr. Witter concerning plaintiff's complaint. The record contains no evidence suggesting what, if any further action was taken by either the plaintiff or the NAACP in connection with plaintiff's charges.

In 1989, Tom Wilcox retired. Before Wilcox' retirement, Dr. Witter approached John Motta, a poultry scientist at the RPRL since 1975, about assuming Wilcox' duties. Dr. Witter proposed combining Wilcox' former position with Motta's present one. Motta agreed to do so, but he suggested that an animal caretaker "wage leader" position be established in order to provide someone to serve as a replacement for him as supervisor of the animal caretakers during periods in which he was absent from the facility. Witter agreed, and Motta, whom it was decided would be the selecting official, prepared a position description for an "Animal Caretaker Leader." (This position shall hereinafter be referred to as "wage leader.")[4]

---

2. "Bleeding" consists of taking blood samples, which are examined by technicians to determine if disease is present.

3. "Banding" consists of inserting a metal band (which contains a number) under the wing of a chicken. It provides a means of identifying the birds for purposes of experimentation.

4. The wage leader position was newly created. Although there had previously been a wage leader in the lab, no one had served in the position since the most recent incumbent had left the RPRL in 1980 or 1981.

After the wage leader vacancy was announced in April, 1989, an informational meeting for those interested in the position was held at the lab.[5] Several interested candidates attended, including the plaintiff and Cecil Kirchen, an animal caretaker who worked on the east side of the lab. Dr. Witter attended the meeting briefly, as did Motta and James Harbin, an administrative officer at the RPRL. Application forms were provided to the potential candidates.

Five animal caretakers applied for the wage leader position. All five were certified as "Best Qualified" by the ARS' Personnel Division in Beltsville, Maryland. Motta, who knew all of the candidates, did not conduct interviews. He selected Kirchen, who is white, to fill the position. Kirchen received a letter officially informing him of his selection on or about May 8, 1989.

Plaintiff, who had been working as an animal caretaker at the RPRL longer than Kirchen, initiated an informal complaint with the Equal Employment Opportunity Commission ("EEOC") on June 5, 1989, alleging that his nonselection for the wage leader position amounted to race discrimination and reprisal for his 1979 contact with the NAACP. Counseling failed to resolve the complaint, and on August 11, 1989, plaintiff filed a formal EEOC complaint. The USDA investigated the complaint, and on January 5, 1990, a report was issued. Informal resolution again failed, and on June 21, 1990, the ARS issued a proposed disposition finding no discrimination. On June 23, 1990, plaintiff rejected this proposed disposition and requested a hearing.

On November 28, 1990, a hearing on plaintiff's complaint was held before an administrative law judge ("ALJ") of the EEOC. On December 6, 1990, the ALJ issued a bench decision finding no discrimination. On March 5, 1991, the USDA adopted the ALJ's recommendation, finding no discrimination.

Plaintiff filed this action on April 4, 1991, naming as defendants John Motta, James Harbin, Clayton Yeutter, then Secretary of Agriculture, and the USDA. In addition to his claims under Title VII, plaintiff also at-tempted to assert a cause of action under 42 U.S.C. § 1985(3), alleging the existence of a conspiracy not to promote him to the wage leader position because of his race. In addition, plaintiff attempted to state a cause of action under Michigan's Elliott Larsen Civil Rights Act, M.C.L.A. § 37.2101 *et seq.* On November 13, 1991, the court issued an Opinion and Order granting a motion by the defendants to dismiss all claims with the exception of plaintiff's claims of racial discrimination and retaliation under 42 U.S.C. § 2000e–16, based on the exclusivity of this remedy. The court also dismissed plaintiff's complaint as to all defendants with the exception of the Secretary of Agriculture, who is the only proper defendant under section 2000e–16.

## ANALYSIS

In its motion for summary judgment, the defendant argues that plaintiff cannot meet his burden of establishing that his nonselection for the wage leader position was attributable to either race discrimination or retaliation in violation of Title VII.

■ Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. One of the principal purposes of Rule 56 is "to isolate and dispose of factually unsupported claims[.]" *Id.* at 323–24, 106 S.Ct. at 2553.

---

**5.** The vacancy was advertised only at the RPRL.

■ Cases involving questions of motive or intent " 'are normally not suited to disposition on summary judgment.' " *Shah v. General Elec. Co.*, 816 F.2d 264, 271 (6th Cir. 1987) (citation omitted). "Nonetheless, '[w]hile the factual disputes involved in most Title VII suits preclude their resolution on summary judgment, summary judgment is available in an appropriate Title VII case.' " *Id.* (citation omitted); *see also Canitia v. Yellow Freight System, Inc.*, 903 F.2d 1064, 1068 (6th Cir.1990) (affirming grant of summary judgment on claim of retaliation); *Boddy v. Dean*, 821 F.2d 346, 348–49 (6th Cir. 1987) (affirming grant of summary judgment on claims of sex discrimination).

### 1. Race Discrimination

■ Title VII of the Civil Rights Act of 1964 requires that all personnel actions affecting employees or applicants for employment in executive agencies "shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–16(a). The plaintiff bears the initial burden of establishing a prima facie case of discrimination under Title VII by a preponderance of the evidence. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). If the plaintiff successfully proves a prima facie case, then the burden shifts to the defendant to rebut the inference of discrimination which arises by articulating a legitimate, nondiscriminatory reason for its action. *Id.* "Once the defendant carries this burden, the burden shifts back to the plaintiff to prove by a preponderance of the evidence 'that the legitimate reasons offered by the [employer] were not its true reasons, but were a pretext for discrimination.' " *Ang v. Procter & Gamble Co.*, 932 F.2d 540, 548 (6th Cir.1991) (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981)). This burden "merges with the ultimate burden of persuading the court that [he] has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. The plaintiff may succeed in meeting this burden either directly, by persuading the court that a discriminatory reason more likely motivated the defendant, or indirectly, by showing that the defendant's proffered explanation is unworthy of belief. *Id.* "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* at 253, 101 S.Ct. at 1093.

■ Where disparate treatment on the basis of race is alleged, the plaintiff's prima facie case under Title VII consists of showing: (1) that the plaintiff was a member of a racial minority; (2) that he and a similarly situated white person received dissimilar treatment; and (3) that sufficient evidence exists from which the court can find a causal connection between race and the alleged act of the defendant. *Cooper v. City of North Olmsted,* 795 F.2d 1265, 1270 (6th Cir.1986). In this case, in order to meet the second and third steps of his prima facie burden, the plaintiff must show that he was qualified for the job for which the employer was seeking applicants, that he was rejected, and that the position was given to another person who was not a member of the protected class. *Ang*, 932 F.2d at 548.

The defendant concedes that the plaintiff has met his burden of establishing a prima facie case of racial discrimination: that he is a member of a racial minority, that he was qualified for the job of wage leader, that he was rejected, and that the job was given to a white applicant. However, the defendant argues that it has met its burden of articulating a legitimate, nondiscriminatory reason for plaintiff's nonselection: namely, that John Motta determined that Cecil Kirchen was the better qualified candidate.

Motta believed that Kirchen's application materials showed better communication skills and leadership ability. More specifically, at the EEOC hearing, Motta testified that there were six "ranking factors" which he considered in selecting among the candidates, four of which involved animal caretaker abilities, and two of which involved other abilities, such as the ability to lead the work of others, and the ability to keep records and make reports. Transcript of EEOC Proceedings (hereinafter "Tr.") at 64–65. While Motta believed that plaintiff's and Kirchen's animal

caretaker abilities were similar, he testified that he found that Kirchen's abilities exceeded those of plaintiff in the areas of leadership potential and communication skills. Kirchen had served as president of the employees' association and participated in office activities. In addition, he had presented gardening seminars in off-duty hours. Motta also considered that Kirchen had done a better, more complete job of preparing his application materials, which, according to Motta, showed that he had communication skills superior to those of the plaintiff, who did not follow the instructions on his application form on a number of the questions. Tr. at 66–68.

Plaintiff argues that he has presented evidence which will show that this articulated legitimate reason for his nonselection is a pretext for racial discrimination.

First, plaintiff argues that the evidence suggests that agency management was so desperate to ensure that he did not get the wage leader position that they gave the position to Kirchen in direct violation of the USDA's own rules. More specifically, plaintiff argues that Kirchen's selection was in violation of USDA directives prohibiting nepotism, because one of the other employees working at the lab, Chester Holton, is Kirchen's stepfather. According to the plaintiff, because Kirchen's responsibilities require him to act in a supervisory capacity over Holton in Motta's absence, the applicable USDA directives are violated.

 Plaintiff's argument that Kirchen's selection violated USDA directives is unsupported. Federal law does impose restrictions against nepotism. *See* 5 U.S.C. § 3110; 5 C.F.R. § 310 *et seq.* However, these restrictions do not prohibit the type of supervisory arrangement presented by Kirchen's selection as wage leader.[6] Although Motta's day-to-day duties were delegated to Kirchen in Motta's absence, Tr. at 56, plaintiff has presented no evidence suggesting that Kirchen has ever been vested with or delegated the authority to "appoint," "employ," or "promote" other employees, including his stepfather.[7] Moreover, although plaintiff argues that USDA directive 410.2 prohibits Kirchen's supervision of Holton, a cursory reading of the directive does not support this argument. Directive 410.2(E) provides that "Close relatives may not be assigned in a supervisor-employee relationship." Under directive 410.2(C)(6), a "relative" is defined as including a wide range of blood and non-blood relatives, including stepfathers.[8] However, in contrast, directive 410.2(C)(3) defines "*close* relatives" (emphasis supplied) as including only "parents, spouse, children, brothers, or sisters." Assuming that Kirchen does supervise his stepfather in Motta's absence, this arrangement simply does not violate the USDA's written directives, which prohibit only supervision of "close relatives" and do not prohibit the supervision of stepfathers by stepsons. Although plaintiff apparently considers Kirchen's selection to be some form of nepotism, no inference of pretext or racial discrimina-

---

6. 5 U.S.C. § 3110(b) provides in pertinent part:
 A public official may not appoint, employ, promote, advance, or advocate for appointment, employment, promotion, or advancement, in or to a civilian position in the agency in which he is serving ... any individual who is a relative of the public official. An individual may not be appointed, employed, promoted, or advanced in or to a civilian position in an agency if such appointment, employment, promotion, or advancement has been advocated by a public official, serving in or exercising jurisdiction or control over the agency, who is a relative of the individual.
 Under 5 U.S.C. § 3110(a)(2), "public official" is defined as an individual "in whom is vested the authority by law, rule, or regulation, or to whom the authority has been delegated, to appoint, employ, promote, or advance individuals, or to recommend individuals for appointment, em-

ployment, promotion, or advancement[.]" Thus, these sections, read together, do not prohibit a federal employee from merely supervising a relative who was "appointed" or "employed" by another federal employee.

7. The court questions whether Motta is even vested with such authority. His decision to select Kirchen was submitted for approval by Dr. Witter, according to testimony presented at the EEOC hearing.

8. Directive 410.2(C)(6) includes the following within the definition of "relative": father, mother, son, daughter, brother, sister, uncle, aunt, first cousin, nephew, niece, husband, wife, father-in-law, sister-in-law, stepfather, stepmother, stepson, stepdaughter, stepbrother, stepsister, half-brother, or half-sister.

tion can be drawn from this perfectly legal arrangement.

Plaintiff argues that there is additional evidence that Motta's stated reason for selecting Kirchen was pretextual. More specifically, plaintiff argues that there is evidence that Motta "secretly" helped Kirchen complete his application. According to the plaintiff, this evidence shows that the reason given for hiring Kirchen is pretextual, because from this fact alone, "the jury could reasonably conclude that the selection process was rigged." Memorandum in Opposition at 9.[9]

In an affidavit given in the EEOC proceeding, Motta stated that none of the applicants had asked him "to fill out the applications." Memorandum in Opposition, Exhibit A, p. 2. In his testimony at the EEOC hearing, Motta also denied having talked to Kirchen about how he was to fill out his application. Tr. at 88–89. In contrast, in his EEOC affidavit, Kirchen stated that he "did talk to John Motta about how to fill out the questionnaire in certain areas that I did not understand." Memorandum in Opposition, Exhibit B, p. 2.

The defendant does not dispute that Kirchen received some assistance in completing his application. Specifically, James Harbin, administrative officer at the Lansing facility, stated in his EEOC affidavit that both Kirchen and another applicant, David White, asked him to review their applications and make comments. Testimony presented at the EEOC hearing indicated that at the meeting announcing the vacancy, Harbin informed all five of the candidates who attended that they could contact him if they had questions about the application process. The plaintiff, who was present at the meeting, denied having heard this announcement, and admitted that he made no attempt to seek assistance in completing his application.

■ "Evidence of preselection operates to discredit the employer's proffered expla-

nation for its employment decision." *Goostree v. State of Tennessee*, 796 F.2d 854, 861 (6th Cir.1986). Clearly, there is no suggestion of preselection in the mere fact that candidates for a position sought and received assistance in completing their application materials, where the opportunity to seek assistance was equally available to all. However, Motta's denial that Kirchen sought and received assistance *from him* is troubling. Motta testified at the EEOC hearing that it was important to him how the application forms were completed, and he based his selection decision largely on how well the applicants performed this task, because their qualifications in the animal caretaker area were similar. Tr. at 68. Yet, Motta denied giving any assistance to Kirchen, who he determined had done the best job of completing his application materials. This unexplained inconsistency in the evidence suggests that Motta's explanation of why he chose Kirchen—in part, his superior ability to complete the application materials—may not be worthy of belief.

■ Under the circumstances, because the plaintiff has established a prima facie case of racial discrimination, and because he has succeeded in casting doubt on the defendant's articulated reason for selecting Kirchen, the court concludes that summary judgment in favor of the defendant is not appropriate. The plaintiff has presented evidence suggesting that Kirchen may have been steered into the wage leader position by Motta. Ultimately, plaintiff will be required to establish not merely preselection, but preselection based on the impermissible motive of race, prohibited by Title VII. "Preselection, of course, does not violate Title VII when such preselection is based on the qualifications of the preselected party and not on some basis prohibited by Title VII." *Goostree*, 796 F.2d at 862.[10]

9. In his memorandum, the plaintiff makes repeated reference to what "the jury" could conclude from the evidence. The court feels constrained to note that plaintiff's complaint contains no jury demand, and the court file contains no indication that the defendant has ever been served with a jury demand, as required by Fed. R.Civ.P. 38(b) and (d). In so noting, the court expresses no opinion on whether the plaintiff

would be entitled to a jury trial if one had been properly demanded.

10. In the EEOC proceedings, plaintiff suggested that Kirchen may have been preselected for the wage leader position by Motta because Kirchen's stepfather, Chester Holton, had been in a car pool with Motta. Even if this were true, nonselection of the plaintiff for this reason, in the

Finally, plaintiff also argues that he is able to establish that the reason given for Kirchen's selection—that he was better qualified—is pretextual, because Kirchen is in fact not qualified for the position of wage leader. The position requires Kirchen to assume the supervisory duties of Motta in the latter's absence. However, plaintiff argues that Kirchen is not capable of performing all of Motta's duties, which include, *inter alia,* artificial insemination, banding, and bleeding of chickens on the west side of the lab. In support of his argument, plaintiff has submitted his own affidavits, in which he states that since Kirchen's selection as wage leader, during Motta's absences, plaintiff has been called upon to perform Motta's duties on the west side of the lab because Kirchen could not perform them.

Kirchen's experience and qualifications as an animal caretaker do appear to have differed somewhat from the plaintiff's. At the time of his selection for the promotion to wage leader, Kirchen had been working on the east side of the lab for several years. The duties of animal caretakers on the east side of the lab primarily included observation of poultry and maintenance of the facilities, duties which plaintiff characterizes as less "sophisticated" than those which he performed on the west side of the lab, the "clean" or disease-free side of the lab.

■ The desire to hire a more qualified applicant is a legitimate business decision, and the fact that the employer may have misjudged the qualifications of its applicants does not expose the employer to Title VII liability. *Henry v. Lennox Industries, Inc.,* 768 F.2d 746, 751 (6th Cir.1985). However, " 'the legitimacy of the articulated reason for the employment decision is subject to particularly close scrutiny where the evaluation is subjective and the evaluators themselves are not members of the protected minority.' " *Id.* (quoting *Grano v. Department of Development of City of Columbus,* 699 F.2d 836, 837 (6th Cir.1983)). Plaintiff is undoubtedly entitled to an opportunity to show that he is more qualified for the wage leader position than Kirchen, in order to establish pretext and to meet his burden of persuasion that his nonselection was racially motivated. At this stage, however, because the court finds that a genuine factual issue is created by the inconsistent evidence regarding whether Motta assisted Kirchen with his application materials, the court finds it unnecessary to address the question of what inferences may, or may not, be drawn from a comparison of Kirchen's and plaintiff's respective qualifications. Plaintiff will have the opportunity to develop the evidence establishing his allegedly superior qualifications at trial.

### 2. *Retaliation*

■ Title VII prohibits an employer from "discriminat[ing] against any individual ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a).[11] The elements of a prima facie case of retaliation are as follows:

(1) that plaintiff engaged in an activity protected by Title VII; (2) that the exercise of his [or her] civil rights was known by the defendant; (3) that, thereafter, the defendant took an employment action adverse to the plaintiff; (4) that there was a causal connection between the protected activity and the adverse employment action.

absence of proof of discriminatory motivation, would not entitle the plaintiff to relief under Title VII. As the court stated in *Goostree,* "[w]e have recently stressed the difference between a hiring process that proceeds based on legally impermissible distinctions between candidates and a 'patronage system that relies on family, friends, and political allies.' " 796 F.2d at 862 (citing *Avery v. Jennings,* 786 F.2d 233, 237 (6th Cir.), *cert.*

*denied,* 477 U.S. 905, 106 S.Ct. 3276, 91 L.Ed.2d 566 (1986)).

11. Although this action is controlled by 42 U.S.C. § 2000e–16, this section incorporates the protections against retaliation contained in § 2000e–3(a). *Sorrells v. Veterans Administration,* 576 F.Supp. 1254, 1259 (S.D.Ohio 1983 (citing *Ayon v. Sampson,* 547 F.2d 446, 449–50 (9th Cir. 1976)).

*Christopher v. Stouder Memorial Hosp.*, 936 F.2d 870, 877 (6th Cir.1991); *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir.1987).

As the court previously noted in ruling on the defendant's motion to dismiss, plaintiff's complaint does not indicate what acts form the basis of his claim of retaliation, nor does it indicate who was responsible for these acts, nor when the alleged retaliation took place.[12] In its motion for summary judgment, the defendant has assumed that plaintiff's claim of retaliation is based on the 1979 incident in which he contacted the NAACP after being reprimanded for taking eggs from the facility. This was the retaliation issue presented by the plaintiff to the EEOC.[13]

The defendant concedes that the plaintiff's contact with the NAACP on an employment-related matter may properly be considered as activity protected by Title VII. The defendant also concedes that management was aware of plaintiff's 1979 complaint to the NAACP. However, the defendant argues that the time span of approximately 10 years between the NAACP complaint and the 1989 promotion selection is to great to establish the required causal connection between the two events. Plaintiff has not responded to this argument attacking his prima facie case, preferring instead to rely on what he believes is a showing of pretext.

■ The court agrees that the 10–year time span between the 1979 NAACP complaint and the 1989 promotion opportunity is too long to provide an inference of retaliatory motive. "[W]here there is no direct proof of a retaliatory motive, retaliation may be imputed if the timing of the retaliatory act is such as to allow an inference of retaliation to arise." *Brown v. ASD Computing Center*, 519 F.Supp. 1096, 1116 (S.D.Ohio 1981) (citing *Sutton v. Nat'l Distillers Products Co.*,

445 F.Supp.. 1319, 1325–26 (S.D.Ohio 1978), *aff'd*, 628 F.2d 936 (6th Cir.1980)); *see also Hochstadt v. Worcester Foundation for Experimental Biology, Inc.*, 425 F.Supp. 318, 324 (D.Mass.), *aff'd*, 545 F.2d 222 (1st Cir. 1976) (requiring plaintiff to show "that her discharge followed her protected activities within such period of time that the court can infer retaliatory motivation."). While the timing of an adverse employment action may in certain situations create an inference of reprisal, the 10–year lag presented in this case creates no such inference. *See Kimbro v. Atlantic Richfield Co.*, 889 F.2d 869, 881 (9th Cir.1989) (use of sick leave over sustained five-year period prior to discharge did not create inference of reprisal for use of ERISA-protected benefits); *Brown*, 519 F.Supp. at 1116 (three-month period between plaintiff's discharge and announcement of her intention to consult EEOC did not provide inference necessary to establish prima facie case of retaliation).

■ Not only does the timing of plaintiff's nonselection for the wage leader promotion fail to supply the necessary causal connection, but there is also a dearth of any additional facts which could create an inference of retaliatory motive. If the agency's management had desired to retaliate against the plaintiff for contacting the NAACP in 1979, they have had plenty of other opportunities to do so since that time. Although opportunities for promotion have apparently been few and far between, other opportunities for retaliation have been presented since 1979, in the form of performance evaluations. Notably, plaintiff has received favorable performance evaluations, not unfavorable ones. Moreover, in his EEOC testimony, plaintiff admitted that John Motta, who selected Kirchen for the promotion, at one point told plaintiff he was right for going to the

---

12. *See* Opinion and Order on Defendants' Motion to Dismiss at 2, n. 2.

13. In his opposition to the defendant's motion, the plaintiff briefly states that on the day after the EEOC hearing, he was reassigned to work on the east side of the lab in retaliation for participating in the hearing. *See* Memorandum in Opposition at 6–7; Affidavit of Charles Clement at 2–3, ¶ 13. However, the plaintiff does not specifically state in his memorandum that it was this post-hearing

transfer, and not the 1979 incident involving the NAACP, which forms the basis for his claim of retaliation. His legal argument on the issue of retaliation, which consists of only two short paragraphs, refers only to plaintiff's nonselection for the promotion, and not to the alleged post-hearing transfer. Under the circumstances, the court will assume that the 1979 incident provides the basis for this claim.

**1050**

NAACP. Tr. at 37. At the EEOC hearing, therefore, plaintiff accused Dr. Witter, not Motta, of being responsible for the alleged reprisal. *Id.* at 38–39. However, Dr. Witter did not actually perform the selection of candidates for the promotion. In addition, Dr. Witter approved plaintiff's favorable performance evaluations between 1979 and 1989. *Id.* at 40. These are hardly the acts of an individual who harbors retaliatory intent.

A plaintiff claiming retaliation must establish that the decision complained about as retaliatory would not have been made "but for" the protected status of the plaintiff. *Canitia*, 903 F.2d at 1068. Even when all of the evidence is viewed in the plaintiff's favor, he has simply failed to present sufficient facts to overcome the defendant's well-supported motion directed to the claim of retaliation. Because no genuine issue of material fact has been presented, summary judgment will be granted in favor of the defendant on this particular claim.

## CONCLUSION

The defendant's motion for summary judgment on plaintiff's claim of retaliation in violation of Title VII is GRANTED. Plaintiff has simply failed to establish a causal connection between his 1979 NAACP complaint of racial discrimination and his nonselection for promotion in 1989.

The defendant's motion for summary judgment on plaintiff's claim of racial discrimination is DENIED. Plaintiff has presented sufficient evidence suggesting that the defendant's articulated reasons for failing to select him for the promotion could be a pretext for racial discrimination.

IT IS SO ORDERED.