# United States Court of Appeals for the Federal Circuit

---

**JERRY EDWARD BECK,**
*Petitioner*

**v.**

**DEPARTMENT OF THE NAVY,**
*Respondent*

---

2019-1205

---

Petition for review of the Merit Systems Protection Board in No. DC-4324-13-0128-B-1.

---

Decided: May 14, 2021

---

KEVIN EDWARD BYRNES, FH&H, PLLC, Tysons, VA, for petitioner. Also represented by RACHEL LEAHEY.

IGOR HELMAN, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for respondent. Also represented by JEFFREY B. CLARK, ROBERT EDWARD KIRSCHMAN, JR., PATRICIA M. MCCARTHY; EVA MARIE CLEMENTS, Office of General Counsel, United States Department of the Navy, Washington, DC.

---

Before REYNA, MAYER, and TARANTO, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* REYNA.

Concurring Opinion filed by *Circuit Judge* TARANTO.

REYNA, *Circuit Judge*.

This appeal marks the decade-long journey of a hardworking man who served his country honorably, only to face workplace discrimination on the basis of that service.

Jerry Edward Beck challenges a decision of the Merit Systems Protection Board denying corrective action under the Uniformed Services Employment and Reemployment Rights Act of 1994. The Board determined that Beck's prior military service was a motivating or substantial factor in the United States Department of the Navy's decision not to select him for an employment position. The Board, however, found that the Navy had permissibly preselected the successful applicant and, thus, met its evidentiary burden to establish that it would have hired her regardless of Beck's military service.

In view of the totality of this record, we conclude that the Navy's preselection determination is not supported by substantial evidence. We further hold that under the Uniformed Services Employment and Reemployment Rights Act of 1994, preselection can buttress an agency's personnel decision to hire a less qualified candidate, but only when the preselection is not tainted by an unlawful discriminatory intent. Because we hold that the Board erred in finding that Beck's nonselection would have occurred regardless of his prior military service as required under 38 U.S.C. § 4311(c)(1), we affirm in part and reverse in part the Board's decision denying Beck's request for corrective action.

## I. BACKGROUND

On May 16, 2011, the United States Department of the Navy (Navy) Office of the Chief of Naval Operations

(OPNAV) published a job announcement for an Event Forum Project Chief. J.A. 267. The vacancy was a full-time, permanent, GS-13/14 grade position with an annual salary range of $89,033 to $115,742. J.A. 267–68. The job's primary responsibility entailed the overall management of senior-level executive events, including conferences, symposia, and other star-flag level meetings on behalf of the Chief of Naval Operations. J.A. 267. Prior to the announcement, OPNAV determined that Captain Tyrone Payton—then Deputy Director, Navy Staff—would hire and serve as the supervisor of the individual selected. J.A. 269. The job posting remained open for four days until May 20, 2011. J.A. 267. By the closing date, only two candidates—Beck and Suzanne Wible—were certified as qualified for the position. J.A. 250. Captain Payton ultimately selected Wible for the vacancy. *Id.*

## A. Jerry Beck's Military Service

Beck, the petitioner, is a Navy veteran who served in various roles for nearly twenty-one years from 1984 until his retirement in 2005.[1] J.A. 261. After graduating high school, he enlisted in the Navy as a junior sailor and gradually rose through the ranks to noncommissioned-officer status, until he became a chief petty officer[2] (CPO). J.A. 260–61.

---

[1]    During active duty, Beck received an Armed Forces Expeditionary Medal, a Kuwait Liberation Medal (Saudi Arabia), another Kuwait Liberation Medal (Kuwait), and two South West Asia Service Medals (bronze stars for "heroic and notorious achievement on the battlefield"). J.A. 261, 1353.

[2]    Enlisted members in the Navy can be apprentices (paygrades E-1–E-3), noncommissioned petty officers (E-4–E-6), and senior noncommissioned chief petty officers (E-7–E-9). *See U.S. Military Rank Insignia*, U.S. DEP'T OF

Beck's curriculum vitae—the veracity of which the Navy does not dispute—demonstrates a series of gradual and progressive accomplishments relevant to this appeal. In the early days of his military career as a sailor, Beck was a cook and had to ensure the availability of consumable items in refrigerated and dry storage areas. J.A. 260, 2367. Over time, his superiors entrusted him with more responsibilities and promoted him to second-class petty officer. J.A. 260. Beck's duties expanded to managing over 15,000 square feet of living space, procuring consumable goods, preparing reports, and supervising and mentoring personnel. *Id.* By 1993, Beck had acquired a Nutrition for the Foodservice Manager certification and completed training in a Commercial Foods and Culinary Arts program. J.A. 261.

Beck's work performance and newly acquired skills did not go unnoticed. Soon, he was promoted to first-class petty officer. The Chief of Naval Operations (CNO) hand-picked Beck to serve as his lead in-flight Logistics Coordinator and Personal Chef. J.A. 260. In the four years he held that position, Beck provided aircraft logistics support for approximately thirty missions per year in over forty-two countries. *Id.* Beck also served as the personal representative to various CNOs, coordinated with foreign embassies

---

DEFENSE,         https://www.defense.gov/Resources/Insignia/ (last visited Jan. 9, 2021). Beck retired as a chief petty officer at the E-7 paygrade. J.A. 261. The Navy recognizes chiefs "for exemplary technical expertise within their rating, superior administrative skills, and strong leadership ability. Most importantly, chiefs bridge the gap between officers and enlisted personnel, acting as supervisors as well as advocates for their Sailors." *The Chief Petty Officer*, NAVAL HIST. AND HERITAGE COMMAND (Aug. 10, 2020, 09:29 AM),    https://www.history.navy.mil/browse-by-topic/communities/chief-petty-officers.html.

and all branches of the US military to provide accommodations for visiting foreign officials, and assumed greater personnel management responsibilities. *Id.*

Beck continued to impress his superiors with his job performance. In 1997, he was promoted to CPO and moved to Washington, DC. J.A. 259, 2369. The scope of his service expanded to encompass coordination of all official functions and diplomatic protocols at the CNO residence, including visits from congressional and flag officers, as well as foreign CNO counterparts in other NATO countries. J.A. 259. He also advised high-ranking officials on administrative decisions and undertook other military-personnel management duties. *Id.* In 1998, Beck became the CPO for the Defense Logistics Agency (DLA) within the US Department of Defense, where he served as project manager in support of senior military officers and senior-executive service personnel. J.A. 258. In that capacity, he provided support to the Agency's Director, Vice Director, and more than 190 senior-executive members of the corporate board. *Id.* He also performed team-leadership functions, including hearing and resolving employee complaints, and maintained effective working relationships with mid- and senior-level civilian and military leaders. J.A. 258–59.

Like many working-class Americans striving to improve their lives, Beck decided to pursue a college education in his thirties. He juggled work and academic duties as a full-time CPO and student at National Louis University (NLU). *See* J.A. 260. By 2001, Beck had earned a bachelor's degree in business. He graduated magna cum laude with a grade-point average (GPA) of 3.91 on a 4.0 scale and received an invitation to be the student speaker at the University's annual graduation ceremony. J.A. 260–61. Beck then went on to earn a master's degree in Human Resource Management and Development from NLU in 2002, graduating with a 3.87 GPA. J.A. 260.

Beck held his post as CPO in the DLA until his retirement from military service on September 30, 2005. J.A. 261.

### B.    Beck Rejoins the Navy as a Civilian

In February 2006, Beck rejoined the Navy workforce as a civilian Special-Events Planning Officer (SEPO), a GS-13-1 grade position in the Office of the Director, Navy Staff. J.A. 253. As part of his duties, Beck planned, coordinated, and provided support for all CNO-hosted events and conferences, including several recurring executive sessions and symposia for Navy senior leadership. *Id.* He worked directly with executive-staff members and the CNO Strategic Action Office to organize training events for all active and retired Navy flag officers and members of the Senior Executive Service. *Id.* When distinguished heads of state, national and local elected officials, and business leaders visited the CNO, Beck's job was to coordinate and oversee logistics. *Id.* The position also required Beck to coordinate closely with senior government and military officials in organizing various types of events and conferences. *Id.*

In September 2007, Beck applied for a new GS-13-7 grade position with higher pay as a Deputy Protocol Officer (DPO) in the OPNAV. *See id.* He was hired and immediately started performing duties as a DPO. But he continued to simultaneously coordinate the functions of SEPO well into the Spring of 2008. *See* J.A. 183. Beck's final task before fully transitioning to his DPO post was to train Wible—his SEPO replacement—after the Navy hired her in March 2008. J.A. 183, 262.

Although the DPO and SEPO duties were not identical, the two positions overlapped in many respects. For example, as DPO, Beck coordinated and executed protocols for various events, foreign dignitary visits, conferences, and other social events; developed agendas and itineraries for CNO-hosted events, such as luncheons, dinners,

receptions, award ceremonies, and special gatherings; and provided oversight in the preparation of detailed reports related to international travel and foreign-CNO counterpart visits. J.A. 253. As the record undisputably demonstrates, Beck had—since at least the early to mid-1990s—held positions related to the coordination and planning of various military events, as well as personnel management.

Over the next three years, Wible coordinated three main annual events—the new-flag, all-flag, and retired-flag officer symposia—alongside other collateral duties. J.A. 14. According to Captain Payton, who supervised Wible's immediate boss, *see* J.A. 2494–95, the symposia had "greatly expanded" every year and required complex planning. J.A. 16 n.5. In particular, Payton explained that the SEPO duties had moved beyond "being limited to protocol" and expanded to "dealing with flag schedules, developing the agenda, coordinating with different offices, dealing with contracts for the logistics, general transportation and room set up issues, and any other task required by the Vice Admiral." *Id.*

As the symposium events increased in size and grandeur, Payton's supervisor, Vice Admiral Bird, purportedly decided to create a new full-time position—an Event Forum Project Chief (EFPC)—for "*an individual*" to focus exclusively on those events. J.A. 2614 (emphasis added); *see also* J.A. 14. Payton allegedly drafted the EFPC job description based on Vice Admiral Bird's vision for the job. J.A. 2505. Bird had explicitly noted his desire to open the job opportunity for competition, rather than announce it as an accretion-of-duties promotion[3] or sole selection, so as to

---

[3] The term "accretion of duties" refers to a promotion that occurs via a noncompetitive process, in which an incumbent employee's position is "classified at a higher grade because of additional duties and responsibilities." *Haywood v. Locke*, 387 F. App'x 355, 357–58 (4th Cir. 2010).

attract applications from "the right candidates." *Id.*; J.A. 15 n.4.

Beck testified that in April 2011, before the public release of any EFPC information, Wible came to visit him at his office to ask for a copy of his résumé. J.A. 2385. Wible then explained that she wanted to "glean some information out of" it so as to adjust her own résumé in anticipation for "a new position that was being developed." J.A. 2385, 2397. During that conversation, Beck testified that Wible told him "she was 'excited, yet overwhelmed' about her new position." J.A. 183.

OPNAV posted the EFPC announcement on the USA-Jobs website on May 16, 2011. J.A. 267. Both Beck and Wible applied for the position. On May 24, 2011, Human Resources (HR) issued an internal certificate listing Wible as the only qualified candidate and selectee. J.A. 251–52. Upon receiving a notification that the announcement had closed and he was ineligible for the position, Beck contacted HR. J.A. 193. HR determined that the certification had been erroneously issued because Beck was qualified and should have been listed as a candidate. J.A. 193, 2506. Payton was informed that a certification error had been made about another individual's application and, thus, Payton requested that the position be reopened to accept the applicant's file. J.A. 2506. HR subsequently cancelled the first certificate and issued a new one featuring Beck as the "best qualified" candidate and Wible as a "qualified" candidate. J.A. 249–50. Neither candidate was interviewed, and Payton selected Wible for the position. Wible then informed Beck of her selection. J.A. 202.

### C.   The Relationship between Beck and Payton

The EFPC selection marked the culmination of a series of escalating workplace incidents, the origin of which—according to Beck—traces back to a September 2010 meeting with Payton. In the Summer of 2010, the CNO decided to reallocate $1.2 million from Payton's budget in the

subordinate command of the Director of Naval Systems (DNS) to perform certain office renovations in the Pentagon. J.A. 2361, 2822. The CNO had assigned Beck, in his capacity as DPO, the development of the renovation plans. Captain Grady, then Beck's supervisor, instructed Beck to inform Payton of the reallocation of funds as a courtesy. J.A. 2362. Given their limited prior interactions, Beck felt uncomfortable about delivering the news to Payton, the Deputy DNS, and decided to make an appointment to tell him in person. J.A. 2365.

Beck recounted the meeting in great detail in his testimony. As soon as Beck walked into Payton's office, he noticed several photos from various P-3 Orion squadrons.[4] *Id.* Beck had served as a naval-air crewman on a P-3 Orion earlier in his career and, thus, immediately felt that the shared experience would be a good way to "break the ice." *Id.* Payton was initially very "enthused" about Beck's affiliation with the P-3 community, and the two had a brief, pleasant exchange. *Id.* Eventually, Payton asked what Beck did on the aircraft, and when Beck told him he was a cook, the conversation turned sour. J.A. 2367. Beck testified that Payton reacted negatively and began pacing around the room repeating "a cook, a cook"—as if in disbelief. *Id.* In a last-ditch effort to turn the conversation around, Beck shared, to no avail, that he had eventually retired as a CPO. *Id.* When Payton heard Beck was a CPO, he blurted out, "[A] chief? . . . I can't believe it" and continued to pace around the room while shaking his head. J.A. 11, 2368. Payton then asked, "[H]ow does a retired chief petty officer become the protocol officer to the [CNO]?" J.A. 2369. Beck tried to explain that he had worked for every CNO since 1992 and that his experiences with them and other senior-level staff contributed to his advancement in the military. *Id.* But the conversation could no longer

---

[4]    P-3 is a term that refers to a large naval aircraft.

be salvaged, and Beck felt he could not "get [Payton] on [his] side." J.A. 2370–71. Payton interrupted Beck and asked, "[L]ook, chief . . . [w]hy are you here?" J.A. 2371.

In response, Beck gave Payton a brief overview of the renovation project and its costs. *Id.* And instead of framing the budget reallocation as an order coming directly from the CNO, he mentioned they needed his support. *Id.* Payton dismissed Beck from his office and told him that "it's going to take somebody from the CNO's office with some authority to pull $1.2 million out of my money." J.A. 2372. Beck excused himself from Payton's office and immediately reported the conversation to Captain Grady, who then picked up the phone and informed Payton that the renovations project was a direct order from the CNO, and Beck was going to be the lead for the project. J.A. 2374.

From then on, Beck alleges that Payton began to undermine his authority on the renovations project by, for example, assigning a "shadow" employee to report back regularly on the status of the renovations, ignoring him at staff meetings, and demeaning Beck before the project's contractors and other third parties. J.A. 2376–79. Payton testified he did not remember having an office meeting with Beck in September 2010. J.A. 2522.

## D.  Procedural Context

Perceiving unfair treatment in the EFPC selection process, Beck approached Deborah Cubbage—the HR specialist working under Payton's supervision—to express his discontent in June 2011. J.A. 189–92. Beck complained that he had not even been interviewed for the position and shared his belief that Payton harbored animus and biases toward him. J.A. 193, 1432. Beck told Cubbage he wanted to file a formal grievance. J.A. 192, 2399. In response, Cubbage indicated "he could not grieve nonselection." J.A. 222. Beck claims that Cubbage then advised him that (1) the only way "to challenge [Wible's] selection lay under federal [Equal Employment Opportunity (EEO)] law," (2)

he should not request a hearing before the Equal Employment Opportunity Commission (EEOC), and (3) he should "pursue a final agency action." J.A. 152.

Based on those recommendations, Beck indicated he would file an EEO complaint, and Cubbage provided him with the contact information of a deputy EEO officer.[5] J.A. 192, 222. Beck met with the EEO officer, who helped "frame" his discrimination complaint within the EEO context. J.A. 1432. Acting pro se, Beck filed a formal EEO action alleging discrimination based on race, gender, age, and disability on September 15, 2011.[6] J.A. 196.

Beck's protests engendered a retaliatory and hostile work environment. Throughout the Summer of 2011, Beck alleges that Payton "ridiculed [him] at office meetings, challenged his responsibilities and workplace authority[,] and attempted to denigrate him before his superiors and co-workers." J.A. 1434–35. It became clear that the grievance had all but foreclosed his prospects for advancement at the OPNAV and, therefore, Beck decided to resign. J.A. 1433. He left to pursue a lower, GS-11 grade position with the US Army in Germany. J.A 202, 1433.

And just as Beck's career prospects at OPNAV ended, a protracted litigation journey had begun.

---

[5]    Cubbage submitted written statements corroborating that she provided the contact information of the EEO officer and told Beck he could not grieve the nonselection. *See* J.A. 192, 222. But she did not confirm or deny recommending a legal strategy.

[6]    Beck is a Caucasian male. J.A. 196. At the time of filing the complaint, he was forty-five years old. *See id.* The Department of Veteran Affairs had previously determined that, in connection to his service, Beck was 80% disabled. J.A. 276. Captain Payton is African American. J.A. 167.

In July 2012, the Navy issued a Final Agency Decision denying his EEO claims.  J.A. 154.  Beck immediately appealed the decision to the EEOC and sought the advice of counsel.  J.A. 1432.  After a discussion of the facts, Beck's lawyer determined that the discriminatory motive behind the nonselection was rooted in Beck's prior military service, rather than an EEO cause of action.  J.A. 152, 1432.  Accordingly, in November 2012, Beck voluntarily withdrew his complaint before the EEOC and filed a claim under the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA) before the Merit Systems Protection Board (Board).  J.A. 152.

A series of discovery-related delays ensued.  The first Administrative Judge (AJ) assigned to the case, Raphael Ben-Ami, allowed the Navy to depose Beck but never granted Beck's requests to depose Payton, Wible, Cubbage, Grady, and Bird.  J.A. 1355.  The AJ allegedly questioned the merits of Beck's case and made remarks that Beck's case was weak because "one service member could not discriminate against another."  J.A. 1354.  In March 2013, the AJ dismissed the case, sua sponte, on grounds that rank-based discrimination was not a violation of the USERRA.  J.A. 1355.  Beck petitioned for review of the Initial Decision and dismissal.  In January 2014, the Board reversed and remanded the AJ's Initial Decision.  J.A. 835.

The case languished for more than two years until Beck filed a petition for a writ of mandamus in this court on February 25, 2016.  J.A. 1357.  That same day, a new, second AJ was assigned to the case and Beck, therefore, withdrew his petition before it was docketed.  *Id.*  On September 15, 2016, the AJ issued an Initial Decision laying out findings of fact and denying corrective action.  J.A. 7.

### E.  The AJ's Factual Determinations

After hearing testimony and reviewing the evidence in the record, the AJ found that Beck's military service was a motivating or substantial factor in the Navy's decision not

to hire him for the EFPC position. J.A. 10. The AJ credited Beck's account of the September 2010 meeting notwithstanding Payton's hesitant testimony. J.A. 12. According to the AJ, Beck's testimony was "inherently more probable" and "more credible" than Payton's, especially in light of contradictions in the record about the Navy's reasons for selecting Wible over Beck. J.A. 13–14. The AJ further found that the Navy "expressed hostility toward [Beck] after Payton learned of [his] military status." J.A. 14. Notably, despite Payton's testimony that he hired Wible because she (1) "had more hands[-]on experience as an event planner and was able to have professional and constructive conversations with three or four star generals"; (2) "could perform under pressure and demonstrated great leadership qualities"; and (3) had an "upper edge" because he had witnessed her perform in "high-intensity events," J.A. 16 n.5, the AJ determined:

> Viewing all of the record evidence in an objective light, it is *unusually clear* that [Beck] had greater objective qualifications: [H]e had more years of experience in the duties required [and] a higher degree of education, he was highly experienced in the requirements of both the DNS and the CNO, he had a respectable reputation with high[-]ranking military officials, and that he, in fact, was the person who trained Wible to perform [the job] duties prior to her selection for the position at issue. These attributes were confirmed when the [Navy] listed [Beck] as the best qualified [candidate]—more qualified than Wible—on the certification form. I observe that Payton's direct testimony in support of Wible's qualifications was general, and was ultimately not supported by the written record. As such, I find that under the circumstances in this case, [Beck] has proffered preponderant substantial evidence of inconsistencies between the

[Navy's] actions during the selection and its ulti-
mate explanation for his nonselection.

J.A. 17–18 (emphasis added).

Next, the AJ considered whether the Navy had estab-
lished that it would have hired Wible regardless of Beck's
military service. On that point, the AJ summarily found—
in one paragraph—that the Navy was "determined to select
Wible for the position" and, thus, it did not matter "who
else had applied." J.A. 19. Accordingly, the AJ denied
Beck's request for corrective action.

Beck filed a petition for review of the AJ's Initial Deci-
sion with the Board on November 22, 2016. J.A. 2799. As
a result of the Board's petition backlog, Beck's petition
went unreviewed for nearly two years. On September 26,
2018, Beck requested permission to withdraw the petition
for review so he could file an appeal with this court.
J.A. 2824. The Board granted his request on October 12,
2018, *see* J.A. 1, and issued the Board's final order, from
which Beck now appeals. We have jurisdiction pursuant to
28 U.S.C. § 1295(a)(9).

## II. STANDARD OF REVIEW

Our review of Board decisions is constrained by the
statutory limits set forth in 5 U.S.C. § 7703(c). We may not
reverse unless the Board's decision is "(1) arbitrary, capri-
cious, an abuse of discretion, or otherwise not in accordance
with law; (2) obtained without adherence to procedures re-
quired by law, rule, or regulation; or (3) unsupported by
substantial evidence." 5 U.S.C. § 7703(c). An agency
abuses its discretion when it renders a decision "based on
an erroneous interpretation of the law, on factual findings
that are not supported by substantial evidence, or repre-
sents an unreasonable judgment in weighing relevant fac-
tors." *Star Fruits S.N.C. v. United States*, 393 F.3d 1277,
1281 (Fed. Cir. 2005) (citation omitted). "Substantial evi-
dence 'means such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion.'" *In re Bayer Aktiengesellschaft*, 488 F.3d 960, 964 (Fed. Cir. 2007) (quoting *Consol. Edison Co. v. NLRB.*, 305 U.S. 197, 229 (1938)).

## III. DISCUSSION

Section 4311 of the USERRA prescribes, in relevant part, that "[a] person who . . . has performed . . . service in a uniformed service shall not be denied initial employment, . . . promotion, or any benefit of employment by an employer on the basis of that . . . performance of service . . . ." 38 U.S.C. § 4311(a). To determine whether an employer has violated the law, the statute requires application of a two-prong test: (1) the employee must first establish, by preponderant evidence, that her military service was a "motivating factor in the employer's action"; and (2) the employer must prove, also by preponderant evidence, that the adverse "action would have been taken in the absence of such . . . service." *Id.* § 4311(c)(1); *Sheehan v. Dep't of Navy*, 240 F.3d 1009, 1013 (Fed. Cir. 2001). Thus, an aggrieved employee can only prevail on a USERRA claim if she meets the requirements of the first prong, and the employer fails to meet its burden under the second prong.

At the outset, we affirm the Board's determinations vis-à-vis the first prong of the USERRA framework. The AJ carefully weighed all the evidence in the record and devoted nine pages of the Initial Decision to substantiate the finding that Payton's animus toward Beck's prior military service as a cook and chief petty officer was a motivating or substantial factor in his nonselection. That same careful analysis, however, is absent from the Board's determination—in one conclusory paragraph—that the Navy met its burden to show it would have taken the same action notwithstanding Beck's prior military service. We therefore affirm the Board's findings of discrimination and focus the discussion that follows on the second prong of the USERRA test.

A.　The Navy's Evidentiary Burden

To evaluate whether the Navy has satisfied its evidentiary burden under the statutory requirements of § 4311(c)(1), we must turn to the record for evidence underlying the Navy's proffered rationale for selecting Wible regardless of Beck's prior military service. The Navy contended that Payton selected Wible because "she was all around more qualified, . . . had more 'hands-on experience['] as an [e]vent [p]lanner [c]oordinator, and had superior proven performance in her current position." J.A. 1535. Payton further testified that he selected Wible because he thought "she had better leadership skills . . . and was a better fit for dealing with three- and four-star admirals." J.A. 2514. Throughout this litigation, the Navy has consistently claimed that only "legitimate" reasons account for Wible's selection, including "her work performance, ability, aptitude, or general qualifications." *See, e.g.*, J.A. 2739. The evidence in the record, however, belies the Navy's rationale for selecting Wible.

The AJ, for example, found that "the reasons the [A]gency provided for selecting Wible over [Beck] [were] contradicted by the record." J.A. 14. The AJ explicitly rejected the Navy's assertion that Wible possessed superior qualifications compared to Beck. *See* J.A. 17 ("Viewing all of the record evidence in an objective light, it *is unusually clear* that [Beck] had greater objective qualifications: [H]e had more years of experience in the duties required [and] a higher degree of education, he was highly experienced in the requirements of both the DNS and the CNO, [and] he had a respectable reputation with high[-]ranking military officials . . . .") (emphasis added).

Payton's testimony that Wible had superior leadership skills is also unavailing. Unlike Beck, who served in leadership and supervisory positions throughout his military career, Wible only served as an administrative assistant to federal contractors prior to becoming a special-events

planning officer.  *See* J.A. 262.  Beck, on the other hand, advised high-ranking officials on administrative matters, performed supervisory personnel-management responsibilities, held project-management roles in direct support of senior military officers and senior executive-service personnel, and worked directly under several CNOs. J.A. 253–60.  The Navy did not present any evidence that Wible ever supervised any personnel or held positions of leadership to substantiate Payton's testimony.  The notion that Wible "had better leadership skills" and "was a better fit" for working with high-ranking officers, *see* J.A. 2514, is simply not supported by the record on appeal.

When asked about his résumé-evaluation process and how he did not arrive at the "objective conclusion" that Beck had more substantial work experience than Wible, Payton traversed the question and indicated that he "based [his] decision on [Wible's] current experience."  J.A. 2559. According to Payton, Wible's experience "was a little bit more than what Mr. Beck offered on his r[é]sum[é]," and that based on Vice Admiral Bird's requirements, he thought Wible "was the better candidate."  J.A. 2559–60.

We agree with the AJ's finding that no objective reviewer could have reasonably concluded that Wible's experience, as a whole, was more substantial than Beck's.  *See* J.A. 17–18.  Although Payton stated that "both r[é]sum[é]s were very impressive," *see* J.A. 2514, Beck simply possessed greater professional training, a higher level of education, more years of experience in event planning, greater supervisory and leadership experience, a more extensive familiarity and experience in dealing with senior military and high-ranking officials, more knowledge and exposure to the inner workings of the OPNAV, and more significant professional and military accomplishments than Wible.

Because the Navy's proffered rationale and evidence for selecting Wible—namely, that she was better qualified for the EFPC position—does not show that she would have

been hired in the absence of Beck's military service as required under § 4311(c)(1), we hold that the Navy has failed to establish its evidentiary burden under the second prong of the USERRA.

### B.   The Board's Preselection Determination

Faced with the lack of evidentiary support to corroborate the Navy's purported rationale for selecting Wible, the AJ proposed, sua sponte, an alternate theory of *preselection* to deny Beck's request for corrective action under § 4311(c)(1).  We next appraise this theory in view of the record.

During the June 23, 2016 Board hearing in this case, AJ DeCrescenzo stated, sua sponte, her view that the Navy had preselected Wible and requested additional briefing on the impact of such a determination on issues related to burden of proof and Beck's USERRA claim.  *See, e.g.*, J.A. 2597 ("[H]ow can you explain to me that [preselection] did not happen?"); J.A. 2598 ("Anything else that weighs against this being a preselection of Ms. Wible?"); J.A. 2667 ("If I find that the Agency was motivat[ed] by preselection of Ms. Wible, what is the impact on the Agency's burden of proof . . . [?]"); *id.* ("If I find essentially that the Agency had a different illegal motive for Mr. [Beck's] non[]selection, what, if any, impact does it have on Mr. [Beck's] USERRA claim[?]").

Following briefing on the preselection issue, the AJ determined that the Navy "would have selected Wible for [the] vacancy regardless of who else had applied" and that it "was determined to select [her] for the position." *Beck v. Navy*, No. DC-4324-13-0128-B-1, 2016 WL 4990269, at *5–6 (M.S.P.B. Sept. 15, 2016); J.A. 19.  The AJ thus issued an implicit finding of preselection without overtly

mentioning the term.[7]  The inference is palpable because if the Navy was "determined" to hire Wible "regardless of who else had applied," J.A. 19, the decision would have logically been made well ahead of the closing of the vacancy—in other words, she would have been *preselected* for the job.

The AJ's one-paragraph preselection determination was presented as an alternative ground to establish the Navy's evidentiary burden under the USERRA's second prong and deny Beck's request for corrective action.  *See* J.A. 18–19.  On appeal, Beck argues that the sua sponte determination was improper because the "AJ became an advocate for the Agency, advancing a novel theory that the Agency itself did not advocate or argue and suggesting that it is a defense to discrimination."  Pet'r's Br. 5.  The Navy, on the other hand, argues that the issue of preselection is a "red herring" because preselection simply did not happen.  Resp't's Br. 22.  The Navy did not raise preselection as an affirmative defense, but it argues on appeal that "[p]reselection can constitute a valid and legitimate reason for the Navy to have selected" Wible.  Resp't's Suppl. Br. 6.

### C.  Substantial Evidence Does Not Support the Preselection Determination

The AJ based her one-paragraph preselection finding entirely on a portion of Payton's testimony.  This was an abuse of discretion.

---

[7]    Despite stating her view that Wible had been preselected during the hearing, *see, e.g.*, J.A. 2597–98, 2667, the AJ's Initial Decision soft-pedaled the issue by mentioning the term "preselection" only once, in a footnote.  *Beck*, 2016 WL 4990269, at \*6 n.6 ("[W]hile the appellant cites to several cases arguing that evidence of preselection may establish pretext in a discrimination analysis, none of those cases derived their jurisdiction from [the] USERRA and are, thus, not limited to its authority.").

In the Initial Decision's last paragraph, the AJ credited Payton's statement at the hearing that "the vacancy . . . at issue was created because Vice Admiral Bird was impressed with Wible, and wanted a job created that would capture and isolate only the[] particular duties that Wible had been performing so well." *Beck*, 2016 WL 4990269, at \*5. Relying on that testimony, the AJ found that the EFPC job description had "mirrored Wible's current performance [sic]." *Id.* The AJ also credited Payton's explanation that despite Beck's relevant comparable experience, "Wible was advantaged by already holding the current responsibilities that the new position would entail," which "gave her an 'upper edge.'" *Id.* Payton's hand-picked testimony in those respects, according to the AJ, "was clear and credible, and is undisputed in the record." *Id.* We disagree.

The AJ's characterization of Payton's testimony as "undisputed" is not accurate. In fact, during the hearing, when the AJ asked Payton about Bird's involvement in the case, Beck's counsel explicitly objected to the line of questioning. *See* J.A. 2502 ("Your Honor, I'm going to object here. They've blocked me from talking to [Vice] Admiral B[i]rd on the grounds that he was not relevant. I mean, when I had questions about other officials, I was told that the only relevant official for this job was [Payton] and that's how it was answered in discovery."). Beck subsequently raised the issue again during his October 20, 2016 Petition for Review of the AJ's Initial Decision. *See, e.g.*, J.A. 2755 (calling out "Payton's hearsay testimony" that Bird sought to create the EFPC position); J.A. 2556 ("[T]here was no mention of any involvement of [Vice] Admiral Bird in any aspect of the process."); J.A. 2757 (expressing concern that the AJ "became an advocate for the Agency" by allowing Payton to "lay[] the foundation for the creation of the position on [Vice] Admiral Bird," while denying Beck the opportunity to call Bird as a witness); J.A. 2759 (arguing that

Payton's lack of credibility and "hearsay response was not subject to reflexive, uncritical acceptance by the [AJ]").

Bird's alleged comments influencing Payton's preselection of Wible played a key role in the AJ's rationale for finding that the Navy was "determined to select" her "regardless of who else had applied." J.A. 19. However, the record is completely devoid of any evidence that Bird sought to either directly or indirectly preselect Wible for the position. To the contrary, Payton testified that Bird did not want the position to be an accretion-of-duties promotion or "a sole selection." J.A. 2505. Rather, Bird had explicitly indicated he wanted to open up the position so as to attract applications for "the right candidates" from which to select "an individual." *Id.*; J.A. 2585, 2614. Bird's only direct appearance in this record is in the form of a one-page sworn declaration submitted on April 15, 2016, in which he stated: "Payton was the selecting official in this matter and . . . made the ultimate decision to select Ms. Wible. He did not need my approval to make this selection." J.A. 1381.

Despite Beck's attempts to depose Vice Admiral Bird, Deborah Cubbage, Suzanne Wible, and Captain Grady, neither AJ Ben-Ami nor AJ DeCrescenzo granted any of Beck's deposition requests. *See* J.A. 30, 350, 356, 1355, 1357, 1387. The Navy, however, was allowed to depose Beck. We have previously held that "it is an abuse of discretion to categorically exclude all witnesses" who may be relevant to a plaintiff's case. *Whitmore v. Dep't of Lab.*, 680 F.3d 1353, 1370 (Fed. Cir. 2012). Such exclusion precludes plaintiffs from "effectively presenting [their case] and leaves only the agency's side of the case in play. This can have a substantial effect on the outcome of the case, and so constitutes harmful error." *Id.*

The Board's hollow, one-paragraph determination also ignores numerous other instances in the record that either detract from, or contradict, the Board's preselection

finding. For instance, Payton's testimony that preselection did not occur has been consistent throughout this litigation. At the same time, the record shows manifest contradictions related to the issue of preselection. During the very same June 23, 2016 hearing, in which the AJ alluded to her alternate preselection theory, Payton claimed he did not know the meaning of the term preselection.

> [AJ]:      Do you know what a preselection is?
> [Payton]:  A preselection?
> [AJ]:      Yeah. Do you know the terminology preselection?
> [Payton]:  In what context?
> [AJ]:      It's a human resources term in terms of civilian service?
> [Payton]:  No.
> [AJ]:      Okay. To paraphrase, it is a situation in which a person is, as you might guess, identified as an ideal candidate for hire and then a selection process is orchestrated in order to place them in that position.
>
> . . . .
>
> [Payton]:  I can tell you that did not happen.

J.A. 2596–97. That testimony is partially inconsistent with Payton's declaration on March 13, 2012, in which he also denied preselection took place while demonstrating a clear understanding of the meaning of preselection.

> Question:  Complainant contends pre[]selection was involved in the selection process because other employees knew about the selection. Can you explain fully?
> Answer:    I can't explain Complainant's pre[]selection accusation. The hiring process was conducted from start to finish with full disclosure and transparency.

> Question:    Complainant says . . . [Wible] had prior
>              knowledge of the position and her selec-
>              tion before the announcement was
>              made. What is your response?
>
> Answer:      This is not a true statement. Ms. Wible
>              may have known a job was open, but
>              she was not preselected because she did
>              not apply for the position until the an-
>              nouncement just before it was going to
>              close. Prior to her applying, there were
>              no other candidates. I think she would
>              have applied sooner if she had
>              knowledge of her being preselected.

J.A. 174.

The record does not show that the AJ was aware of Pay-
ton's previous inconsistent 2012 statements regarding pre-
selection, but it does reveal that the AJ questioned the
testimony offered on the issue.

> [AJ]:        Okay. And how can you explain to me
>              how [preselection] did not happen?
>
> [Payton]:    Because after Ms. Wible was selected
>              and I informed her of her selection, she
>              told me she was not aware that the po-
>              sition was even open. She was called
>              by a coworker outside of our organiza-
>              tion that had saw it actually posted and
>              had recommended that she apply for
>              the position. She didn't even know the
>              position was even being advertised.
>
> [AJ]:        Okay. Anything else that weighs
>              against this being a preselection of Ms.
>              Wible?
>
> [Payton]:    I can say we — I wouldn't question the
>              integrity of [Vice Admiral Bird], that
>              that was his motive. That definitely
>              wasn't my motive.

J.A. 2597–98.  Still, Payton's narrative, if true, would only explain that Wible was not aware of having been preselected.  It does not prove she was not preselected for the job.

Payton's preselection testimony is also directly at odds with Beck's sworn testimony that Wible asked him for a copy of his résumé—before the EFPC position was even made public—because she wanted to use it as an example from which to prepare her own résumé in anticipation of "a new position that was being developed."  J.A. 2385, 2397.  During that conversation, Beck testified that Wible told him "she was 'excited, yet overwhelmed' about her new position."  J.A. 183.

The record is inconsistent at best on the issue of preselection.  It is also incomplete.  Had Beck been allowed to depose witnesses, the record would paint a clearer picture of the Navy's alleged preselection.  We have previously held that an AJ's determination "that is based on findings made in the abstract and independent of the evidence which fairly detracts from his or her conclusions is unreasonable and, as such, is not supported by substantial evidence." *Whitmore*, 680 F.3d at 1376.

In view of the totality of this underdeveloped record, we hold that the AJ's one-paragraph, sua sponte preselection determination, which relied solely on Payton's cherry-picked testimony, is not supported by substantial evidence.  The exclusion of numerous witnesses by AJs Ben-Ami and DeCrescenzo "caused substantial harm and prejudice" to Beck's ability to develop a complete case and record on appeal.  *Id.* at 1368.  The record is devoid of the evidentiary threshold necessary to buttress the AJ's determination that the Navy would have hired Wible regardless of Beck's prior military service, as required under the second prong of the USERRA.  Accordingly, we conclude that the Board's preselection and discovery-related determinations are "arbitrary, capricious, an abuse of discretion, or otherwise not

in accordance with law" and "unsupported by substantial evidence."  5 U.S.C. § 7703(c).

* * *

Under most circumstances, our judgment would call for vacatur and remand of the Board's preselection and discovery-related determinations.  *See Whitmore*, 680 F.3d at 1376 ("Because considerable countervailing evidence was manifestly ignored, overlooked, or excluded, we must vacate and remand for consideration of all the evidence.").

But this case is not ordinary.  It has lingered in legal limbo for well over a decade and has been marked by countless delays and discovery errors, none of which can be attributed to Beck.  Vacatur and remand is not appropriate under the facts of this case because it would further prolong and exacerbate the harm and undue prejudice that has been perpetrated upon Beck.[8]

A remand is also unnecessary under these facts.  There is no principled reason to depart from well-established Supreme Court jurisprudence interpreting analogous employment anti-discrimination statutes, such as Title VII of the Civil Rights Act of 1964.  As explained below, we are guided by a wealth of precedent demonstrating that preselection can apply with full force to a USERRA cause of action.  Under this record, even if the Board determined that

---

[8]    The Merit Systems Protection Board has operated without a quorum for more than four years and, therefore, cannot issue final decisions on any petitions for review (PFR).  TRISTAN L. LEAVITT, MESSAGE FROM THE ACTING CHIEF EXEC. & ADMIN. OFFICER, U.S. MERIT SYSTEMS PROTECTION BOARD FISCAL YEAR 2020 ANNUAL REPORT 1 (Jan. 19, 2021), https://www.mspb.gov/MSPBSEARCH/ viewdocs.aspx?docnumber=1800131&version=1806402&a pplication=ACROBAT.  As of December 31, 2020, there was a backlog of 3,071 PFRs at the Board.  *Id.*

preselection occurred on remand, the Navy cannot, as a matter of law, establish its evidentiary burden under the USERRA statutory requirements because the unlawful discrimination and preselection are inextricably intertwined.

### D.  Preselection under the USERRA

We hold that preselection is a category of personnel practices that can give rise to a USERRA claim when, as here, the plaintiff has established that the preselection was coupled to unlawful discrimination based on an individual's current or past military service.  Our holding today is grounded in well-known Supreme Court jurisprudence interpreting Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–e-17.

We begin by recognizing the dearth of precedents examining the scope of preselection as a factor in a USERRA inquiry.  Notwithstanding this gap in the case law, the Supreme Court has noted that the USERRA "is very similar to Title VII, which prohibits employment discrimination 'because of . . . race, color, religion, sex, or national origin' and states that such discrimination is established when one of those factors 'was a motivating factor for any employment practice, even though other factors also motivated the practice.'" *Staub v. Proctor Hosp.*, 562 U.S. 411, 417 (2011).  Our analysis therefore embarks from this authority and looks to analogous case law in other employment contexts under Title VII.

Save for few notable distinctions, such as the divergent scheme for burden-of-proof allocation among USERRA and Title VII cases,[9] courts have long analyzed both statutes

---

[9]   In *Sheehan*, this court explained that "[t]he procedural framework and evidentiary burdens set out in § 4311 . . . are different from those in discrimination cases under Title VII of the Civil Rights Act of 1964 . . . , as

analogously in other employment contexts. *See, e.g., Tridico v. District of Columbia*, 130 F. Supp. 3d 17, 31 (D.D.C. 2015) (finding agreement with other courts that hostile-work-environment claims under the USERRA and Title VII are analogous); *Montoya v. Orange Cty. Sheriff's Dep't*, 987 F. Supp. 2d 981, 1016 (C.D. Cal. 2013) (incorporating Title VII standards to evaluate a harassment claim under the USERRA); *Mock v. City of Rome*, 851 F. Supp. 2d 428, 434 (N.D.N.Y. 2012) (considering Title VII case law to evaluate a hostile-work-environment claim under the USERRA); *Vega-Colon v. Wyeth Pharm.*, 625 F.3d 22, 33 (1st Cir. 2010) (analyzing a claim of adverse employment action in violation of the USERRA under a Title VII framework); *Lisdahl v. Mayo Found. for Med. Educ. & Rsch.*, 698 F. Supp. 2d 1081, 1110 (D. Minn. 2010), *aff'd sub nom. Lisdahl v. Mayo Found.*, 633 F.3d 712 (8th Cir. 2011)

---

described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and subsequent decisions." *Sheehan*, 240 F.3d at 1014 (internal citation omitted). "Under the *McDonnell Douglas* framework, the burden of persuasion in Title VII actions always remains with the employee." *Velazquez-Garcia v. Horizon Lines of Puerto Rico, Inc.*, 473 F.3d 11, 17 (1st Cir. 2007). Thus, under Title VII: (1) the employee must first prove discriminatory animus, (2) the employer then has the burden to show some legitimate nondiscriminatory basis for the adverse action, and (3) the employee must ultimately show that the adverse action is rooted in pretext. *Id.* (citations omitted). Conversely, under the USERRA, (1) the employee must show that discriminatory animus was a motivating factor in the adverse action, and (2) the employer then has the burden to show that the adverse action would have taken place in the absence of the protected status. *See* 38 U.S.C. § 4311. Thus, unlike in the Title VII framework, the burden shifts entirely from employee to employer once the employee establishes discriminatory animus under the USERRA.

("Although many of the cited cases involve alleged Title VII violations, . . . '[t]here is no reason to understand "adverse employment action" differently in the USERRA context.'").

As to preselection, courts have held that the practice "does not violate Title VII when such preselection is based on the qualifications of the party and not on some basis prohibited by [law]." *Oliver-Simon v. Nicholson*, 384 F. Supp. 2d 298, 310 (D.D.C. 2005) (quoting *Goostree v. Tennessee*, 796 F.2d 854, 861 (6th Cir. 1986)). "[T]here is nothing per se improper about 'preselection,' at least from the standpoint of Title VII." *Glass v. Lahood*, 786 F. Supp. 2d 189, 224 (D.D.C. 2011), *aff'd*, 2011 WL 6759550 (D.C. Cir. 2011). "Preselection, even if accompanied by subsequent manipulation to guarantee that the preselected candidate gets the position over more qualified candidates, does not equate automatically to discrimination." *Hunnicutt v. S.C. Dep't of Revenue*, Civil Action No. 3:08–2589–JFA–JRM, 2010 WL 1344632, at *10 (D.S.C. Feb. 26, 2010). Even if favoritism occurred in the selection process, preselection is not unlawful if based on the selectee's qualifications, and not on some basis prohibited by law. *Nyunt v. Tomlinson*, 543 F. Supp. 2d 25, 39 (D.D.C. 2008), *aff'd sub nom. Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445 (D.C. Cir. 2009) (citation omitted).

The bar for scrutiny of personnel decisions in the workplace is, in general, set fairly low. This court has acknowledged the existence of "thousands of . . . routine personnel decisions regularly made by the [armed forces] which are variously held nonjusticiable or beyond the competence or the jurisdiction of courts to wrestle with." *Voge v. United States*, 844 F.2d 776, 780 (Fed. Cir. 1988) (citing examples of nonjusticiable personnel decisions). "Title VII does not ensure the best will be selected—only that the selection process will be free from impermissible discrimination." *Blue v. U.S. Dep't of Army*, 914 F.2d 525, 541 (4th Cir. 1990) (quoting *Casillas v. U.S. Navy*, 735 F.2d 338, 344 (9th Cir. 1984)). Without evidence that preselection is

itself motivated by unlawful discrimination, "pre[]selection does not bear materially on [a] Title VII claim." *Downing v. Tapella*, 729 F. Supp. 2d 88, 94 (D.D.C. 2010).

Although preselection by itself is not prohibited by the law, "[e]vidence of preselection operates to discredit the employer's proffered explanation for its employment decision." *Goostree*, 796 F.2d at 861 (citations omitted). Preselection can also constitute "relevant evidence of the employer's motivation." *Id.* "The motivation is key because preselection based on a reason not prohibited by the federal anti-discrimination statutes is not probative of pretext." *Blackledge v. Ala. Dep't of Mental Health & Mental Retardation*, Civil Action No. 2:06CV321-ID, 2007 WL 3124452, at *24 (M.D. Ala. Oct. 25, 2007).

These precedents demonstrate that preselection under Title VII jurisprudence may be lawful. Employers may exercise wide latitude in making personnel-hiring decisions. Such latitude in personnel-recruitment policies also extends to agencies of the armed forces. *See Allphin v. United States*, 758 F.3d 1336, 1341 (Fed. Cir. 2014) ("The merits of a military staffing decision are committed 'wholly to the discretion of the military.'") (citations omitted).

But deference to an employer under Title VII is not without limits. An employer shall not couple preselection to unlawful discrimination. To do so is to exceed the permissible bounds of the law.

Here, the Navy strayed from those legal boundaries. The Board's determination that Beck's prior military service was a motivating or substantial factor in the Navy's decision not to select him for the EFPC vacancy was detailed and well supported by the record. The Board's findings of fact revealed that the EFPC selection process in this case was tainted with discriminatory motive against Beck. *See supra*, Section I.E. We agree, in view of the record as a whole, with the Board's determination that Payton's animus toward Beck's prior military service as a cook and CPO

played a role in his nonselection. Payton's testimony at the June 2016 hearing corroborates this proposition. The following exchange ensued when Payton was asked about Human Resources certifying Beck as the best qualified candidate.

> Question:  Okay. [A]nd did you realize that Mr. Beck was listed as the best qualified?
>
> Answer:  I think during my testimony for the EEO complaint, I have said no. And so, I'm going to go with that answer. Reviewing the paperwork, it's obvious that it was listed as he was the best qualified person.
>
> Question:  All right. And did you ever find — do you know — have you ever had occasion to know whether you could choose a qualified over a BQ, best qualified?
>
> Answer:  Well, I think I asked that question. Am I bound by HR — HR's assessment on who I want to recommend we select. And Ms. Cubbage informed me that I was not.

J.A. 2513.

The Navy's proffered rationale for selecting Wible, in view of the above testimony, strains credulity. After closing of the EFPC announcement, Human Resources provided Payton with an Internal Certificate bearing the names of only two individuals—Beck, who was listed as "best qualified," and Wible, who appeared in the line immediately below and was listed as "qualified." *See* J.A. 250. The certificate instructed Payton to click on the applicants' names to view their résumés and identify his selection from the "selection order menu." *Id.* That Payton felt compelled to ask whether he was "bound" to select the individual HR had labeled as the best-qualified candidate is illustrative of his motive and intent. Given the numerous inconsistencies

in Payton's testimony throughout the record, we see no reason to lend credence to the Navy's hiring explanations. "Evidence of preselection operates to discredit the employer's proffered explanation for its employment decision." *Goostree*, 796 F.2d at 861 (citations omitted).

When an employer couples unlawful discrimination with preselection to foreclose an applicant's access to employment, the employer cannot disentangle the discrimination from actions that would otherwise constitute benign preselection. As the Supreme Court articulated it: "The employer is a wrongdoer; he has acted out of a motive that is declared illegitimate by the statute. It is fair that he bear the risk that the influence of legal and illegal motives cannot be separated, because he knowingly created the risk and because the risk was created not by innocent activity but by his own wrongdoing." *NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 403 (1983), *abrogated on other grounds by Dir., Off. of Workers' Comp. Programs, Dep't of Lab. v. Greenwich Collieries*, 512 U.S. 267 (1994).

We therefore conclude that, to the extent the Navy could establish that it preselected Wible, it nevertheless cannot disentangle its purported preselection from its USERRA-based discrimination. Unlike oil and water, the two are wholly miscible.

We further hold that under the USERRA, preselection can buttress an agency's personnel decision to hire a less qualified candidate, but only when the preselection is not tainted by an unlawful discriminatory intent. Our judgment is guided by the Supreme Court's Title VII jurisprudence, which we conclude applies with full and equal force in the USERRA context.[10] Because we conclude that the

---

[10]    Because we extend the full scope of preselection under Title VII cases to the USERRA context, we need not reach the issue of whether the USERRA can serve as a

Navy has not satisfied its evidentiary burden to show that it would have hired Wible in the absence of Beck's prior military service, we reverse the Board's denial of Beck's request for corrective action.

*  *  *

Lastly, the Navy argues on appeal that the Board's decision should be affirmed on the alternate ground that the USERRA does not extend to acts of discrimination against a service member based on military *rank* or *status* in the uniformed services.[11]  *See, e.g.*, Resp't's Br. 24–32.  We decline the Navy's invitation to hold that an individual's military rank falls outside the gamut of potential classifications protected under the USERRA.  For purposes of this appeal, it suffices to note that § 4311 explicitly protects the "performance of *service*" in the armed forces. 38 U.S.C. § 4311(a) (emphasis added).

Throughout the span of more than two decades, the scope of Beck's military service expanded to encompass, among other things, cooking and performing the functions of a CPO—the two activities that underlie the Board's findings of military service-based discrimination.    An

---

jurisdictional basis for the Board to consider preselection as a violation of 5 U.S.C. § 2302(b)(6), which prohibits "grant[ing] any preference or advantage not authorized by law, rule, or regulation to any employee or applicant for employment (including defining the scope or manner of competition or the requirements for any position) for the purpose of improving or injuring the prospects of any particular person for employment."

[11]    Neither "rank" nor "status" appears in the § 4311 statutory text.  We note, however, that the AJ's Initial Decision used the terms interchangeably to refer to military service.  *See, e.g.*, J.A. 18 ("[Beck's] military status was at least a motivating factor in his nonselection . . . .").

individual's commitment and obligation to, for example, provide health care (nurse), fly aircraft during armed conflict (fighter pilot), write legal briefs (Judge Advocate General's officer), or even cook meals for fellow service members ought not to diminish the significant contributions of that person's service in the armed forces.

## IV. CONCLUSION

Beck has endured a decade of delayed justice. We cannot correct every wrong in society; but we remedy *this* wrong today. Working-class men and women striving to improve their lives must frequently overcome great barriers—including increasing inequality, insidious discrimination, and the lack of access to opportunity—in the arduous path to success. In a world where inequities often go unchecked, the judiciary stands as a beacon of hope to ensure that justice and the values and principles that form the bedrock of democracy do not become a mere afterthought.

Honest and hardworking members of our military aspiring to improve their lives deserve to be treated with equality and respect under the law, regardless of social status or the scope of their military service or related duties. That is the overarching purpose of the USERRA, which pays homage to all our military service members who, day in and out, help to strengthen the backbone of our country through their countless contributions.

For the reasons set forth in this opinion, we hold that the Board erred in denying Beck's claim for corrective action under § 4311(c) of the USERRA. We remand the case to the Board with instructions to enter corrective action that is consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED**

COSTS

Costs for the petitioner.

# United States Court of Appeals for the Federal Circuit

---

**JERRY EDWARD BECK,**

*Petitioner*

**v.**

**DEPARTMENT OF THE NAVY,**

*Respondent*

---

2019-1205

---

Petition for review of the Merit Systems Protection Board in No. DC-4324-13-0128-B-1.

---

TARANTO, *Circuit Judge*, concurring in part and in the judgment.

I join the opinion through Section A of the Discussion, and I concur in the judgment.

I agree with affirmance of the Merit Systems Protection Board's finding at the first step of the analysis required by *Sheehan v. Department of Navy*, 240 F.3d 1009, 1013 (Fed. Cir. 2001): Substantial evidence supports the finding that Mr. Beck showed that his performance of his military service was a motivating factor in the Navy's decision not to select him for the position at issue in 2011, and Mr. Beck's showing comes within the coverage of 38 U.S.C. § 4311. I agree, as well, with reversal of the Board's finding, at the second step of the *Sheehan* analysis, that the Navy carried its burden to show that it would have taken

the same action in the absence of the motivating factor found at *Sheehan*'s first step. I agree, therefore, with reversal of the Board's rejection of Mr. Beck's claim for corrective action, which the Board must provide when this matter returns to the Board.

I respectfully depart from the majority in one respect. I would decide no more, under the second step of *Sheehan*, than that the Navy failed to support its assertion that it had legitimate reasons for not choosing Mr. Beck for the position in May 2011. The assertion of legitimate reasons was the only basis on which the Navy sought to meet its *Sheehan* burden. Although the Navy addressed "preselection" in response to our request for supplemental briefing about the topic, the Navy did not, before the Board or in its brief as appellee, present any meaningful argument that it met its *Sheehan* burden on any ground other than that it had legitimate reasons, in a comparative-qualifications judgment, for selecting Ms. Wible over Mr. Beck. In its brief as appellee, the Navy, in its very short discussion of "preselection," asserted only that the Board did not rely on preselection, that no preselection occurred because the Navy had legitimate reasons for choosing Ms. Wible, and that there was "no finding of intent here," *i.e.*, an intent to give "an unauthorized preference." Navy Response Br. at 23 (internal quotation marks omitted); *id.* at 22–23. The Navy presented no argument that it should prevail at the second step of *Sheehan* based on "preselection" even if the evidence did not support its assertion that it had legitimate reasons for choosing Ms. Wible. In this circumstance, the conclusion that the evidence does not support the Navy's assertion of legitimate reasons suffices for reversal, and I would not address questions about preselection in this case.